[Cite as *State v. Loy*, 2021-Ohio-403.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
WASHINGTON COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | Case No. 19CA21 |
| Plaintiff-Appellee, | : | |
| v. | : | DECISION AND JUDGMENT ENTRY |
| Charles W. Loy, Jr., | : | |
| Defendant-Appellant. | : | **RELEASED 2/08/2021** |

APPEARANCES:

Timothy Young, Ohio Public Defender, and Peter Galyardt, Assistant Ohio Public Defender, Columbus, Ohio, for appellant.

Nicole Tipton Coil, Washington County Prosecuting Attorney, Marietta, Ohio, for appellee.

Hess, J.

**{¶1}** After a jury found Charles Loy, Jr., guilty of two counts of aggravated murder, murder, two counts of aggravated burglary, tampering with evidence, and firearm specifications in connection with the death of Frederick Uselton, the trial court merged several offenses for sentencing purposes and imposed an aggregate sentence of life in prison with parole eligibility after 33 years. In his first assignment of error, Loy contends that the trial court abused its discretion and violated his rights to due process and a fair trial when it refused to instruct the jury on voluntary manslaughter as an inferior-degree offense of aggravated murder and murder. Because the evidence presented at trial did not reasonably support both an acquittal on the charged offenses and a conviction on the offense of voluntary manslaughter, the trial court properly refused to instruct the jury on voluntary manslaughter. Accordingly, we overrule the first assignment of error.

**{¶2}** In his second assignment of error, Loy contends that his aggravated murder sentence is clearly and convincingly unsupported by the record and that we have authority to review his sentencing challenge under R.C. 2953.08(G)(2). Loy maintains that the General Assembly did not intend for R.C. 2953.08(D)(3)'s prohibition on appellate review of certain aggravated murder sentences under R.C. 2953.08 to apply to the current aggravated murder sentencing scheme, and if it did, the prohibition violates federal and state equal protection rights. Loy has not established that we have authority to modify or vacate his sentence on the grounds advanced in this appeal, and even if he had, he has not demonstrated that his sentence is clearly and convincingly unsupported by the record. Accordingly, we overrule the second assignment of error and affirm the trial court's judgment.

## I. FACTS AND PROCEDURAL HISTORY

**{¶3}** The Washington County grand jury indicted Loy on one count of aggravated murder in violation of R.C. 2903.01(A), one count of aggravated murder in violation of R.C. 2903.01(B), one count of murder in violation of R.C. 2903.02(A), one count of aggravated burglary in violation of R.C. 2911.11(A)(1), one count of aggravated burglary in violation of R.C. 2911.11(A)(2), one count of tampering with evidence in violation of R.C. 2921.12(A)(1), and a firearm specification for each offense except tampering with evidence. Loy pleaded not guilty, and the matter proceeded to a jury trial.

**{¶4}** Janet Shaw testified that she was involved with Loy for about six years and at one time considered him to be her boyfriend. However, around February 2016, she developed strong feelings for Uselton, and he became her boyfriend. For about six months, she alternated between living and sleeping with Loy and Uselton. Shaw went to

Uselton because they loved each other, and she went to Loy because he supplied her with Suboxone and Xanax. The morning of August 27, 2016, Uselton picked Shaw up from Loy's house. At some point, she took Suboxone and Xanax, and during the afternoon, she fell asleep in Uselton's bed. When she woke up, it was dark, and Uselton was lying beside her. While they were talking, Shaw heard the bedroom door open and a "boom." Uselton said, "Somebody shot me," and Shaw heard a second "boom." She rolled out of bed, turned on the lights, and saw blood coming out of Uselton's mouth. She went next door, where Uselton's brother lived, to have someone call 9-1-1 or "go make sure it was real."

{¶5} Shaw acknowledged that she has mental health and drug issues. She told police that she was on Seroquel and Lithium for a split personality, schizophrenia, and trouble with reality. Shaw testified that she hears voices and spent three weeks in a mental ward immediately after the shooting. In the summer of 2016, she lost 50 to 60 pounds from methamphetamine use, and after the shooting, she tested positive for LSD, methamphetamine, and heroin. Shaw admitted she is a liar, manipulates men for drugs and money, and believed Loy and Uselton were in competition for her. She told police that Loy thought she was his girlfriend. Shaw admitted that when she was with Uselton, she would message Loy about how much she loved him. Shaw testified that Uselton used marijuana and tried methamphetamine once but never gave her drugs, assaulted her, molested her, or held her against her will. Shaw testified that Donna Paredes claimed to have witnessed Uselton molest Shaw during a seizure, but Shaw did not believe her.

{¶6} Ethel West testified that she lives with Elom Maine, Uselton's brother. On August 28, 2016, around midnight, two women were outside their apartment yelling

Shaw's name and talking about Shaw being held against her will. West told them Shaw was not there but might be next door. After West went to sleep, Maine woke her up and said that Uselton had been shot and might be dead, so she called 9-1-1. West saw Shaw, who seemed like she was "mystified" and on drugs and said she thought Loy and Uselton were playing a joke on her. West testified that Shaw was Uselton's girlfriend but played Uselton and Loy against each other. West told police that Shaw had been lying to Loy about Uselton beating her and holding her against her will.

{¶7}    Donna Paredes testified that she is friends with Shaw and Loy and knew Uselton. Around the early morning hours of August 28, 2016, Loy was worried about Shaw and asked Paredes to go to Uselton's home to check on her. Shaw had left Loy's house the previous morning and was supposed to return but never did. Paredes told police she was concerned because in the past, Shaw said that she feared Uselton, that she thought he was the devil, and that he had molested her during seizures. Paredes had also heard that Uselton was supplying Shaw with drugs. Paredes asked her sister, Amber Hendershot, to accompany her to Uselton's property because Paredes was not allowed there and was concerned about getting arrested for trespassing. Paredes waited in the car while Hendershot tried to get in touch with Shaw, but they ultimately left without seeing her. When Paredes and Hendershot reported back to Loy, he got mad and kicked them out of his home. Later, Paredes's boyfriend, Nick Boley, brought her back because Loy wanted to apologize. At some point, Loy left in his Cavalier but later asked Paredes and Boley to pick him up at the Bada Bing bar. When they did, Loy was sweaty and would not answer questions about what happened to his Cavalier.

**{¶8}** Police found fresh tire tracks in the grass at a location near Uselton's home and a cigarette butt in the roadway that had ash on the end of it. They discovered footprints between the area where the cigarette butt was found and a window in a spare room in Uselton's home. There were three, eight-inch high cinder blocks stacked by the window, the screen was torn, a fan had been removed from the window, and some rotted wood from the windowsill was on the ground. There were two nine-millimeter shell casings on the floor in Uselton's bedroom. Uselton had bullet wounds in his chest and above his right eye. Police found one bullet lodged in the bed beneath him, and a second bullet was removed from his body during an autopsy. In the vicinity of the Bada Bing bar, police located Loy's vehicle and found a loaded nine-millimeter Hi-Point pistol, an orange ski mask, gloves, and Loy's jacket on the ground inside some tires. Testing revealed that Loy's DNA profile was on the cigarette butt and pistol trigger, that the shell casings had been fired from the pistol, and that the bullets had characteristics consistent with bullets test-fired from the pistol. Loy's hands tested positive for particles characteristic of gunshot primer residue, and a search of his home resulted in the discovery of a box of nine-millimeter ammunition, a pistol holster, and a notebook containing an unfinished letter stating:

> Mom and Dad
>
> I hope that u don't hate for what I done. Didn't mean to ever hurt u guys like this but life is so messed up. Just couldn't deal with no more. This is easy way to deal. Having everything in life wasn't what it was about. I shouldn't let her play the game with me. I thought she wouldn't do that to me. Please take care of Jax and Calvin someone when bring u some money of mine so don't have to worry about paying for me put in ground. I know its wasn't not right what I did. Sorry to put u threw this I really am. Mom please take care of urself. I will be with [sic]

Loy has a son named Calvin and a dog named Jax.

{¶9}    Loy testified that he knew Uselton for 20 to 25 years and Shaw for about four years.  Loy and Shaw lived together in various places, including with Uselton for about six months.  Around February 2016, Shaw left Loy and moved in with Uselton.  During the next six months, she alternated between living with Uselton and Loy for varying amounts of time.  Shaw lost a lot of weight and claimed Uselton "had her doing meth," would not let her have a cell phone or internet, and told her there were Mexicans on the front porch who would kill her if she went outside.  Shaw told Loy she thought Uselton had done sexual things to her while she was having a seizure, and one time Shaw was "all black and blue" after being at Uselton's home.  The day before the shooting, Shaw left Loy's home after having spent about a week there.  Paredes told Loy that Uselton had picked Shaw up, and Loy asked Paredes to check on Shaw because he was worried about her because Uselton was "known to * * * give her all those drugs and take advantage of her."  Loy did not go because he did not want to cause or get into trouble.  Boley took Paredes and Hendershot to Uselton's house, where Boley stacked cinder blocks by a window, removed the fan, tore the screen, and entered the home to see if Shaw was there but got scared and left.  After the group reported back to Loy, he went to the home around 4:00 a.m. and entered through the window because he was at "the breaking point" and "had to know what was going on."

{¶10} Loy wore a ski mask so he "wouldn't be seen," wore gloves because of "fingerprints and stuff," and carried a loaded pistol which he did not plan to use.  Once inside, Loy headed for the front door but heard something and instead opened Uselton's bedroom door.  Uselton was lying down, Shaw was standing beside him, and they may have been talking.  Uselton said, "I'm going to shoot you."  Loy testified, "I thought he had

a gun beside him, because he moved his hand.  And then I just shot him."  Uselton said, "I've been shot," and Loy shot him again because he was "scared."  Loy testified that "it was just like I had enough.  I couldn't – I was – had the – I was – just broke me down [sic]."  When asked why he could not control himself, Loy testified, "It's just like I hit rock bottom.  I couldn't take it no more [sic]."  Loy ran out the front door and drove away.  After having car trouble, he hid his jacket, mask, gloves, and pistol.  Loy admitted that he lied to police about various matters because he was scared.  Loy also admitted that he has sold and grown marijuana, that he got Xanax "off the street" for Shaw to help with her seizures, and that police found a Vicodin pill and a vial of cocaine in his home.  Loy claimed that he wrote the letter police found around the end of June 2016 when he was going through a "bad depression."  He claimed Shaw "just kept telling me, * * * that he was molesting her, and he was doing this and that, wouldn't let her outside.  And it just – it just kept building and building inside of me, you know."  Loy later suggested the letter referred to another female.

{¶11}  The jury found Loy guilty as charged.  The trial court merged the aggravated murder, murder, and aggravated burglary counts for sentencing purposes, and it sentenced Loy to life in prison with parole eligibility after 30 years for aggravated murder in violation of R.C. 2903.01(A), three years for the firearm specification accompanying that count, and 36 months for tampering with evidence.  The court ordered that the aggravated murder and firearm specification sentences run consecutive to each other and that the tampering with evidence sentence run concurrent with them for an aggregate sentence of life in prison with parole eligibility after 33 years.

{¶12}  We granted Loy leave to file a delayed appeal.

## II.  ASSIGNMENTS OF ERROR

{¶13}  Loy assigns the following errors for our review:

1.  The trial court abused its discretion and violated Charles Loy's rights to due process and a fair trial when it denied his request to instruct the jury on voluntary manslaughter.

2.  Charles Loy's aggravated murder sentence is clearly and convincingly unsupported by the record, and Ohio's purported appellate prohibition was neither intended by the General Assembly, nor is it constitutional.

## III.  JURY INSTRUCTIONS

{¶14}  In the first assignment of error, Loy contends that the trial court abused its discretion and violated his rights to due process and a fair trial when it denied his request for a jury instruction on voluntary manslaughter as an inferior-degree offense of aggravated murder and murder.  Loy maintains that "Ohio law has generally recognized that romantic relations between men and women can be a reasonable source of both sudden passion and rage, and serious provocation."  Loy asserts that Shaw manipulated Uselton and him into being at odds with each other and that his testimony and note show that he had "reached his breaking point" when he found Uselton in bed with Shaw and killed him.

{¶15}  We review a trial court's refusal to instruct a jury on voluntary manslaughter for an abuse of discretion.  *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 152.  The phrase "abuse of discretion" implies that the decision was "unreasonable, arbitrary, or unconscionable."  *Id.* at ¶ 91.

{¶16}  " 'A trial court has broad discretion to decide how to fashion jury instructions, but it must "fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." ' "

*State v. Price*, ___ Ohio St.3d ___, 2020-Ohio-4926, ___ N.E.3d ___, ¶ 22, quoting *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus; *see generally* R.C. 2945.11 ("In charging the jury, the court must state to it all matters of law necessary for the information of the jury in giving its verdict").  The Supreme Court of Ohio requires that a jury instruction " 'present a correct, pertinent statement of the law that is appropriate to the facts.' "  *Price* at ¶ 22, quoting *White* at ¶ 46.

{¶17}  "When the indictment * * * charges an offense, including different degrees, or if other offenses are included within the offense charged, the jury may find the defendant not guilty of the degree charged but guilty of an inferior degree thereof * * * ."  R.C. 2945.74; *See also* Crim.R. 31(C).  "An offense is an 'inferior degree' of the indicted offense where its elements are identical to or contained within the indicted offense, except for one or more additional mitigating elements."  *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988), paragraph two of the syllabus, construing R.C. 2945.74 and Crim.R. 31(C).  A defendant is entitled to an instruction on an inferior-degree offense when the evidence presented at trial would reasonably support both an acquittal on the charged offense and a conviction on the inferior-degree offense.  *See State v. Shane*, 63 Ohio St.3d 630, 632, 590 N.E.2d 272 (1992).  When the evidence meets this test, the trial court must instruct the jury on the inferior-degree offense.  *Id.*  When the evidence does not meet this test, an instruction on the inferior-degree offense is not required.  *Id.*

{¶18}  A person is guilty of voluntary manslaughter if the person knowingly causes the death of another "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that

is reasonably sufficient to incite the person into using deadly force." R.C. 2903.03(A). Voluntary manslaughter is an inferior-degree of murder, *Shane* at 632, and aggravated murder, *State v. Benge*, 75 Ohio St.3d 136, 140, 661 N.E.2d 1019 (1996).

**{¶19}** Before instructing the jury on voluntary manslaughter as an inferior-degree offense, the trial court must conduct an inquiry into the mitigating circumstances of provocation which "must be broken down into both objective and subjective components." *Shane* at 634. The court "must determine whether evidence of reasonably sufficient provocation occasioned by the victim has been presented to warrant such an instruction." *Id.* at paragraph one of the syllabus. An objective standard applies to this inquiry: "For provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *Id.* at 634-635. The trial court "should evaluate the evidence in the light most favorable to the defendant, without weighing the persuasiveness of the evidence." *Id.* at 637. If the objective standard is met, "the inquiry shifts to the subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage." *Id.* at 634. At that point, the court must consider the " 'emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time.' " *Id.*, quoting *Deem* at paragraph five of the syllabus.

**{¶20}** The totality of the evidence in this case, when viewed in a light most favorable to Loy, did not reasonably support both an acquittal on the charged offenses of aggravated murder and murder and a conviction on the inferior-degree offense of voluntary manslaughter. Some of Loy's testimony suggests that he shot Uselton out of fear for his own safety because Uselton supposedly threatened to shoot him and moved

his hand as if reaching for a gun. In addition, some evidence suggests that Loy shot Uselton out of fear for Shaw's safety because of alleged past misconduct by Uselton. However, evidence that a defendant feared for the safety of himself or another " 'does not constitute sudden passion or a fit of rage as contemplated by the voluntary manslaughter statute.' " *State v. Sudderth*, 4th Dist. Lawrence No. 07CA38, 2008-Ohio-5115, ¶ 14, quoting *State v. Harris*, 129 Ohio App.3d 527, 535, 718 N.E.2d 488 (1998); *see also State v. Mack*, 82 Ohio St.3d 198, 201, 694 N.E.2d 1328 (1998) ("Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or [a] fit of rage"). Moreover, "past incidents * * * do not satisfy the test for reasonably sufficient provocation when there is sufficient time for cooling off." *Mack* at 201. Although it is unclear how recently Uselton had allegedly harmed or mistreated Shaw, there is no evidence he did so during the week prior to the shooting when she primarily lived with Loy. Therefore, Loy had sufficient time to cool off between any past incidents and the shooting. *See generally State v. Burkes*, 8th Dist. Cuyahoga No. 106412, 2018-Ohio-4854, ¶ 30 (explaining that courts have held that "a 'cooling off' period can be a very short time"); *Sudderth* at ¶ 3, 16 (victim hit defendant for five to six minutes in kitchen, and time it took for defendant to sit down, lie about going to use the bathroom, go upstairs, retrieve a gun, and return to the kitchen to shoot the victim was sufficient time to cool off).

{¶21} Loy's suggestion that reasonably sufficient provocation existed because he found Uselton and Shaw in bed together is not well-taken. Loy was aware of Shaw's relationship with Uselton for about six months prior to the shooting, believed Shaw was at Uselton's home, covertly entered the home during the early morning hours while carrying a loaded gun, and went to Uselton's bedroom. Under these circumstances, no

reasonable jury could find that the discovery of Uselton and Shaw in bed together was sufficient to arouse the passions of an ordinary person beyond the power of his or her control and incite the use of deadly force. *See generally State v. Williams*, 9th Dist. Summit No. 24169, 2009-Ohio-3162, ¶ 15, 21 (insufficient evidence of provocation where defendant who shot ex-wife's lover knew of their "years-long sexual relationship" so seeing them in bed together "could not have aroused in him the shock which accompanies an initial revelation," knew the victim was inside the ex-wife's apartment during the early morning hours, broke into the apartment carrying a loaded gun, and went directly to the bedroom to confront them).

**{¶22}** The record does not contain evidence of serious provocation occasioned by the victim that was reasonably sufficient to incite the use of deadly force. Because no reasonable jury could have found Loy not guilty of aggravated murder and murder but guilty of voluntary manslaughter, the trial court did not err when it refused to instruct the jury on voluntary manslaughter. Accordingly, we overrule the first assignment of error.

## IV. AGGRAVATED MURDER SENTENCE

**{¶23}** In the second assignment of error, Loy challenges his aggravated murder sentence. Loy maintains that R.C. 2953.08(G)(2) provides the only mechanism for appellate review of a sentence. He asks this court to review his aggravated murder sentence under R.C. 2953.08(G)(2) and conclude that his sentence is clearly and convincingly unsupported by the record. He asserts that findings the trial court made about which seriousness and recidivism factors in R.C. 2929.12 apply are unsupported by the record, and he suggests that the record does not support his sentence as a whole under R.C. 2929.11 and 2929.12. Loy recognizes that R.C. 2953.08(D)(3) appears to

prohibit appellate review of his aggravated murder sentence under R.C. 2953.08 but urges us to disregard the prohibition, arguing that the General Assembly did not intend for it to apply to the current aggravated murder sentencing scheme. Alternatively, he asserts R.C. 2953.08(D)(3) violates federal and state equal protection rights because "there is no rational basis for a two-track process that grants appellate review to all felony sentences except aggravated murder sentences."

{¶24} R.C. 2953.08(G)(2) states:

The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.

The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law.

{¶25} In *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 21, the Supreme Court of Ohio stated that "R.C. 2953.08 specifically and comprehensively defines the parameters and standards—including the standard of review—for felony-sentencing appeals." *Marcum* at ¶ 21. "Applying the plain language of R.C. 2953.08(G)(2)," the court unanimously held "that an appellate court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing

evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law. " *Id.* at ¶ 1. The court also stated:

> We note that some sentences do not require the findings that R.C. 2953.08(G) specifically addresses. Nevertheless, it is fully consistent for appellate courts to review those sentences that are imposed solely after consideration of the factors in R.C. 2929.11 and 2929.12 under a standard that is equally deferential to the sentencing court. That is, an appellate court may vacate or modify any sentence that is not clearly and convincingly contrary to law only if the appellate court finds by clear and convincing evidence that the record does not support the sentence.

*Id.* at ¶ 23.

{¶26} In *State v. Jones*, Slip Opinion No. 2020-Ohio-6729 ("*Jones IV*"), the Supreme Court of Ohio recently revisited this statement. *Jones IV* involved an appeal from *State v. Jones*, 2018-Ohio-498, 105 N.E.3d 702 ("*Jones III*"), the third decision the Eighth District Court of Appeals issued in connection with the criminal appeals of Randy and Carissa Jones. *Jones IV* at ¶ 11. In *Jones III*, a majority of the judges of the Eighth District, sitting en banc, joined the holding in the lead opinion that *Marcum* "interpreted R.C. 2953.08(G)(2)(a) to permit an appellate court to modify or vacate a sentence if it finds that the record does not support the sentencing court's findings under R.C. 2929.11 and 2929.12." *Jones IV* at ¶ 13, citing *Jones III* at ¶ 5-6, 21 (lead opinion) and *Jones III* at ¶ 22 (Stewart, J., concurring in judgment only). "*Jones III* also included a new opinion by the three-judge panel that had heard *Jones I* and *Jones II*." *Jones IV* at ¶ 15. "In that opinion, the panel applied the reasoning of the en banc court's lead opinion to the Joneses' cases and concluded that the record did not support their sentences because those sentences did not advance the overriding purposes of felony sentencing, as stated in former R.C. 2929.11(A), 2011 Am.Sub.H.B. No. 86." *Id.*, citing *Jones III* at ¶ 151-152. The panel vacated the Joneses' sentences and remanded their cases for resentencing.

*Id.*, citing *Jones III* at ¶ 153. The Supreme Court accepted jurisdiction in the state's appeal from *Jones III* on the following proposition of law: " 'R.C. 2953.08(G)(2) does not allow a court of appeals to review the trial court's findings made pursuant to R.C. 2929.11 and R.C. 2929.12.' " *Jones IV* at ¶ 16.

**{¶27}** In resolving the appeal, the Supreme Court initially addressed the en banc court's holding that R.C. 2953.08(G)(2)(a) permits an appellate court to review whether the record supports findings under R.C. 2929.11 and 2929.12. *Id.* at ¶ 26-29. The court clarified that the statements in *Marcum* at ¶ 23 are dicta, *id.* at ¶ 27, and explained that "nothing in the text of R.C. 2953.08(G)(2)(a) otherwise supports the holding of the en banc court" because "R.C. 2929.11 and 2929.12 are not among the statutory provisions listed in R.C. 2953.08(G)(2)(a)," *id.* at ¶ 28. "The Eighth District therefore erred by relying on dicta in *Marcum* and by concluding that R.C. 2953.08(G)(2)(a) provides a basis for an appellate court to modify or vacate a sentence based on the lack of support in the record for the trial court's findings under R.C. 2929.11 and 2929.12." *Id.* at ¶ 29.

**{¶28}** Next, the Supreme Court considered the lead opinion's suggestion "that an appellate court may review whether the record supports the *sentence as a whole* under R.C. 2929.11 and 2929.12" which "effectively allows the appellate court to substitute its judgment for that of the trial court concerning the overall selection of a sentence that is compliant with R.C. 2929.11 and 2929.12." (Emphasis sic.) *Id.* at ¶ 30. The Supreme Court concluded that "nothing in R.C. 2953.08(G)(2) permits such an action by an appellate court." *Id.* The court explained that "R.C. 2953.08(G)(2)(a) clearly does not provide a basis for an appellate court to modify or vacate a sentence if it concludes that the record does not support the sentence under R.C. 2929.11 and 2929.12 because * * *

R.C. 2929.11 and 2929.12 are not among the statutes listed in the provision." *Id.* at ¶ 31. It also explained: "When we consider the evolution of R.C. 2953.08(G), it is evident that an appellate court's conclusion that the record does not support a sentence under R.C. 2929.11 or 2929.12 is not the equivalent of a conclusion that the sentence is 'otherwise contrary to law' as that term is used in R.C. 2953.08(G)(2)(b)." *Id.* at ¶ 34. "R.C. 2953.08(G)(2)(b) therefore does not provide a basis for an appellate court to modify or vacate a sentence based on its view that the sentence is not supported by the record under R.C. 2929.11 and 2929.12." *Id.* at ¶ 39. As a result, "the lead opinion erred by permitting this type of review." *Id.*

{¶29} Finally, the Supreme Court considered "whether the judgments of the merits panel vacating the Joneses' sentences might nonetheless be justified under R.C. 2953.08(G)(2)." *Id.* at ¶ 40. The court explained:

> Nothing in R.C. 2953.08(G)(2) permits an appellate court to independently weigh the evidence in the record and substitute its judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12. In particular, R.C. 2953.08(G)(2) does not permit an appellate court to conduct a freestanding inquiry like the independent sentence evaluation this court must conduct under R.C. 2929.05(A) when reviewing a death penalty-sentence. *See State v. Hundley*, ___ Ohio St.3d ___, 2020-Ohio-3775, ___ N.E.3d ___, ¶ 128 (recognizing that R.C. 2929.05(A) requires de novo review of findings and other issues within its scope).

*Id.* at ¶ 42. Therefore, the court held that the merits panel had "erred in the same way the lead opinion did" and that its "ultimate judgments were erroneous." *Id.* The court reversed the Eighth District's judgments and reinstated the sentences imposed by the trial court. *Id.* at ¶ 43.

{¶30} Based on *Jones IV*, we conclude that it is not necessary for us to address Loy's arguments regarding R.C. 2953.08(D)(3) because even if we had authority to review

his aggravated murder sentence under R.C. 2953.08(G)(2), that provision does not permit us to conduct the type of sentencing review he seeks. Specifically, it does not permit us to modify or vacate a sentence on the basis that a trial court's R.C. 2929.12 findings are unsupported by the record or that the record does not support the sentence as a whole under R.C. 2929.11 and R.C. 2929.12. We observe that in *State v. Patrick*, Slip Opinion No. 2020-Ohio-6803, ¶ 15, the Supreme Court of Ohio recently explained that "R.C. 2953.08 does not prescribe the sole right to appeal a criminal sentence." However, Loy did not argue that any other statutory provision authorizes this court to conduct the type of sentencing review he seeks.

**{¶31}** Even if we could consider Loy's claim that his sentence is clearly and convincingly unsupported by the record, we would conclude it lacks merit. Initially, Loy challenges the trial court's finding that R.C. 2929.12(B)(6) applies, i.e., "[t]he offender's relationship with the victim facilitated the offense," indicating his conduct was more serious than conduct normally constituting the offense. Loy maintains that his relationship with Uselton did not facilitate the offense "in the traditional sense of that phrase" because "[t]his was not a situation involving discrepancies in power such as a parent-child, teacher-pupil, or employer-employee relationship." However, R.C. 2929.12(B)(6) does not require such a power dynamic. As the state suggests, the trial court could infer that Loy and Uselton's relationship as former roommates facilitated the offense because it provided Loy with information that aided him in reaching Uselton's bedroom undetected.

**{¶32}** Loy also challenges the trial court's finding that no factors were present that made his conduct less serious than conduct normally constituting the offense. Loy maintains that R.C. 2929.12(C)(2) and (C)(3) apply; however, his argument actually

implicates R.C. 2929.12(C)(2) and (C)(4). Under those provisions, factors indicating the offender's conduct is less serious than conduct normally constituting the offense include the fact that the offender "acted under strong provocation," R.C. 2929.12(C)(2), and that "[t]here are substantial grounds to mitigate the offender's conduct, although the grounds are not enough to constitute a defense," R.C. 2929.12(C)(4). Loy relies on the same arguments he made under his first assignment of error. However, evidence that Loy knew about Shaw's relationship with Uselton for months, covertly entered Uselton's home during the early morning hours when he believed Shaw was there, brought a loaded gun with him, and shot Uselton in the head and chest while he was lying in bed despite the lack of evidence that he had recently harmed or mistreated Shaw supports the trial court's finding that R.C. 2929.12(C)(2) and (C)(4) do not apply.

{¶33} Next, Loy asserts that the trial court erred when it addressed R.C. 2929.12(D)(5), which provides that a factor indicating an offender is likely to commit future crimes is that "[t]he offender shows no genuine remorse for the offense." Loy observes that in the sentencing entry, the court found that he expressed "no remorse" rather than no genuine remorse. He asserts that it is clear from the record that he expressed remorse during his trial testimony and allocution when he apologized to Uselton's family. Loy acknowledges that the court questioned his sincerity during the sentencing hearing when it stated, "I'm going to find that he shows no genuine remorse for the offense. He's actually been blaming the victim, arguing that it was a justifiable homicide." However, Loy maintains that during his apologies, he "owned his wrongdoing, expressed that he was sorry, and made no excuses." He asserts that "[t]o conflate the substantive defense strategy" of proving mitigation "with the authentic apologies during his testimony and

allocution is not a reasonable credibility determination.  Allocation and legal defense are separate parts of the system and unrelated."

{¶34}  Based on the trial court's statements at the sentencing hearing, its omission of the word "genuine" from its finding in the sentencing entry that Loy showed "no remorse" appears to be a clerical error.  Moreover, the trial court was free to conclude that Loy's apologies were not sincere, particularly in light of his trial testimony suggesting that Uselton's supposed mistreatment of Shaw and threat to Loy led to the shooting.  "The trial court is in a much better position than us to observe appellant, his voice inflections and demeanor and use those observations in weighing the credibility of his expressed remorse."  *State v. Hudnall*, 4th Dist. Lawrence No. 04CA3, 2004-Ohio-5369, ¶ 17.

{¶35}  Next, Loy asserts that the trial court erred when it found that no factors were present that indicated he was not likely to commit future crimes.  He maintains that R.C. 2929.12(E)(4), i.e., "[t]he offense was committed under circumstances not likely to recur," applies because "the trio in question no longer exists."  However, the fact that the specific trio involved in this case no longer exists because Loy killed Uselton does not mean that the trial court had to conclude that the general circumstances present in this case, i.e., a love triangle, are not likely to recur.   Loy also asserts that R.C. 2929.12(E)(5) applies, i.e., he showed "genuine remorse for the offense," but as we previously explained, the trial court was free to reach the opposite conclusion.

{¶36}  Finally, Loy appears to suggest that the record does not clearly and convincingly support his aggravated murder sentence as a whole under R.C. 2929.11 and 2929.12.  However, "in imposing a sentence it is the role of the trial court to determine the weight afforded to any particular statutory factors, mitigating grounds, or other

relevant circumstances." *State v. Pitzer*, 4th Dist. Highland No. 19CA23, 2020-Ohio-4322, ¶ 19. " 'Simply because the court did not balance the factors in the manner appellant desires does not mean * * * that clear and convincing evidence shows that the court's findings are not supported by the record.' " *Pitzer* at ¶ 20, quoting *State v. Butcher*, 4th Dist. Athens No. 15CA33, 2017-Ohio-1544, ¶ 87.

**{¶37}** For the foregoing reasons, we overrule the second assignment of error.

V.  CONCLUSION

**{¶38}** Having overruled the assignments of error, we affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty-day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
        Michael D. Hess, Judge




**NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**