[Cite as *State v. Woodfork*, 2025-Ohio-2786.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

State of Ohio,                          :

    Plaintiff-Appellee,            :       Case No. 23CA22

    v.                             :

                                   :       DECISION AND
Marvan Woodfork, Sr.,                   :       JUDGMENT ENTRY

    Defendant-Appellant.           :

_____

APPEARANCES:

Elizabeth R. Miller, Ohio Public Defender, and Jacob Seidl, Assistant Ohio Public Defender, Columbus, Ohio, for Appellant.

Jeffrey C. Marks, Ross County Prosecuting Attorney, and Pamela C. Wells, Ross County Assistant Prosecuting Attorney, Chillicothe, Ohio, for Appellee.

_____

Smith, P.J.

{¶1} Appellant, Marvan Woodfork, Sr., appeals the judgment of the Ross County Court of Common Pleas convicting him of two counts of murder in violation of R.C. 2903.02, both special felonies with firearm specifications, two counts of having weapons while under disability in violation of R.C. 2923.13, both third degree felonies, and tampering with evidence in violation of R.C. 2921.12, also a third degree felony. Appellant raises four assignments of error on appeal,

however, finding no merit to any of his arguments, all of his assignments of error are overruled. Accordingly, the judgment of the trial court is affirmed.

FACTS

{¶2} On January 20, 2023, appellant was indicted by a Ross County Grand Jury on one count of murder in violation of R.C. 2903.02, as well as one count of felony murder, also in violation of R.C. 2903.02. Both murder counts were special felonies with firearm specifications. The predicate offense for the felony murder charge was felonious assault, a second-degree felony in violation of R.C. 2903.11. Appellant was also indicted on two counts of having weapons while under disability in violation of R.C. 2923.13, both third-degree felonies, and tampering with evidence in violation of R.C. 2921.12, also a third-degree felony. The charges stemmed from a shooting that occurred on January 10, 2023, at the Christopher Inn & Suites (hereinafter "hotel") in Chillicothe, Ohio, which resulted in the death of Jennoro J. Elmore, Jr.

{¶3} The record reveals that appellant and Kayleigh Horn were staying in a room at the hotel that had been rented by appellant's mother and was listed under her name. The two had gone there in an effort to avoid the victim, who had most recently been in a relationship with Horn. According to appellant, the victim had been threatening both himself and Horn with death for several months prior, up to and including the night of the shooting. According to appellant, the victim had

texted threats and had also made verbal threats over the phone to Horn.  A search

of Horn's phone verified that threats had been texted to Horn from the victim.  The

record further reveals that the victim came to the hotel looking for the two on the

night of the shooting, entering the hotel through a side door and then going to the

desk to ask for the room number.  Because the room was not rented in either

occupant's name, the victim was unable to locate the two and returned to his

vehicle.  According to appellant, he shot the victim from the hotel window while

the victim was on the phone with Horn, again making verbal threats to kill them.

{¶4} Appellant then quickly fled the hotel, leading law enforcement on a

chase that ended with appellant voluntarily surrendering himself once law

enforcement tracked him to a homeless encampment in a wooded area in

Chillicothe.  Upon being interviewed by law enforcement, appellant confessed to

shooting the victim several times, explaining that he did so because he was scared

for both himself and Horn.  He initially denied disposing of the firearm that was

used in the commission of the offense, but then drew a map identifying the location

of the gun so that law enforcement could retrieve it.  The victim was provided

treatment at the scene and was then transported to the hospital, where he died.  A

later autopsy confirmed that his cause of death was multiple gunshot wounds.

{¶5} Once indicted, appellant pled not guilty to the charges and he was

appointed counsel due to his indigency.  Appointed counsel filed a notice of

appearance at the January 31, 2023 arraignment and then filed a demand for discovery. Discovery was provided the same day. A pretrial conference was scheduled to take place on February 21, 2023, however, there is no transcript in the record related to that hearing. Then, on February 28, 2023, a journal entry was filed scheduling a three-day jury trial to take place beginning May 9, 2023. No pretrial motions were thereafter filed by either party.

{¶6} The record contains a May 4, 2023 status hearing transcript indicating defense counsel had informed the court that appellant wished to retain his own hired counsel. Appellant appeared via video conference and directly informed the court of his desire to hire counsel and stated that he was requesting a continuance of 30 to 60 days in order for his family to continue to gather enough money to pay a retainer. Appellant informed the court that he had been trying "to get ahold of" his appointed attorney to request a continuance. He also stated that although his appointed attorney had tried to visit him in the jail, he had been unable to see him due to "being on lock down because of COVID and different things." However, the trial court denied appellant's request for a continuance, stating that the request was untimely, that no other attorney had indicated a willingness to take the case, and that the court would not continue the case based upon "mere speculation." Nevertheless, the trial was continued just four days later, on May 8, 2023, at the

request of defense counsel due to a last minute discovery issue that arose,

attributed to the State.

{¶7} The matter was eventually tried to a jury beginning on August 29,

2023. The trial began with voir dire, where the State raised a peremptory

challenge to the sole black juror. Defense counsel raised a *Batson* challenge to the

removal. Finding the State's proffered explanation for the removal was sufficient

to overcome the challenge, the trial court permitted the juror to be removed from

the jury pool. The State then introduced 19 witnesses and 82 exhibits.

{¶8} Taylor Simmons testified that she was working the front desk of the

hotel on the night of the incident. She testified that a gentleman came in looking

for Kayleigh Horn. She told him there was no room listed under that name after

checking the computer. She testified that he then left. A video of the encounter

was played for the jury. Tiffany Spangler testified that she was at work in her

office next door to the hotel on the day of the incident. Upon hearing gunshots,

she walked to the parking lot and saw a body lying beside a car and a phone lying

just under the car. She testified that she could hear screaming and was then joined

by a woman whom she had just seen in a hotel window. She further testified that

she spoke to law enforcement when they arrived.

{¶9} Detective Adam Steele of the Chillicothe Police Department also

testified. He stated that he knew the victim and Horn had been living together at

Horn's residence. He testified that Horn was standing by the victim in the parking lot and he asked her if "Snoop" was the one that shot the victim.[1] In response, Horn shook her head yes. Officer Terry Brown, Chief Ron Myers, and Detective Chris Fyffe all testified that they were involved in the manhunt for appellant.

{¶10} Detective Lucas Lindamood also testified. He stated that he was initially called to the crime scene, where he found the victim's vehicle with four bullet holes through the front windshield and Horn's vehicle parked beside it. He noted a second floor hotel window located right above it was opened. He obtained a search warrant to search room 424, where both appellant and Horn had been staying. He interviewed Kayleigh Horn at the scene and then interviewed appellant after he had been taken into custody. He testified that he first provided appellant *Miranda* warnings and then recorded the interview. He testified that appellant admitted to shooting the victim and eventually drew a map so law enforcement could locate the missing firearm. He further testified, upon cross examination, that when appellant was informed the victim had died, he put his head down and said "I am not a killer."

{¶11} Portions of the interview were played for the jury. The video of the interview depicted appellant sitting at a table in a blue one-piece paper-type suit that had apparently been issued by the jail. Appellant informed Detective

---

[1] The record indicates appellant's nickname is "Snoop."

Lindamood that he and Horn had been receiving death threats via telephone from the victim for the last six to seven months. He stated that the victim was at the hotel and was on the phone with Horn when "I shot his dumb ass." When asked how many times, appellant stated "three times," but that he wasn't sure. He further stated "I was scared." He stated that the victim had told Horn he was going to kill both of them. Although appellant initially denied having disposed of the gun, the video later depicts appellant directing law enforcement as to where they could find the gun. This was done after law enforcement provided appellant with a cigarette, pizza, and Mountain Dew.

{¶12} Several forensic scientists from the Ohio Bureau of Criminal Investigation also testified. Of relevance herein, Kelsey Carr, a forensic scientist in the firearm section, testified that in her expert opinion the recovered bullets submitted for testing by the Chillicothe Police Department were fired from the firearm that was also submitted for testing. Further, Chief Deputy Coroner Sean Swiatkoski testified that multiple gunshot wounds caused the victim's death.

{¶13} At the conclusion of the State's case, defense counsel raised a Crim. R. 29(A) motion for acquittal as to all counts. The motion was denied by the trial court. Defense counsel then sought lesser included offense and inferior degree offense instructions as to both murder charges. Counsel's argument will be discussed in more detail below. However, the trial court also denied this request.

Thereafter, the defense rested without presenting any evidence. The jury ultimately convicted appellant on all counts. The trial court found that counts one and two merged for purposes of sentencing and also that counts three and four merged for purposes of sentencing. The State elected to proceed on counts one and three. The court sentenced appellant to a mandatory 15 years to life in prison on count one, along with a mandatory 3-year prison term for the attendant firearm specification, to be served consecutively. The court sentenced appellant to a 36-month prison term on count three, as well as a 36-month prison term on count five, all to be served consecutively to one another, and consecutive to a sentence appellant was presently serving in a separate case. The total aggregate sentence imposed was 24 years to life in prison.

{¶14} Appellant now brings his appeal, setting forth four assignments of error for our review.

ASSIGNMENTS OF ERROR

I.     THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING MARVAN'S MOTION FOR A CONTINUANCE, EFFECTIVELY DENYING HIS RIGHT TO RETAIN COUNSEL OF HIS CHOICE UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 RIGHTS UNDER THE OHIO CONSTITUTION.

II.    THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN REFUSING TO INSTRUCT THE JURY ON

THE INFERIOR AND LESSER INCLUDED OFFENSES OF MURDER AND FELONY MURDER.

III.  THE TRIAL COURT ERRED BY EXCUSING THE ONLY BLACK VENIRE PERSON AFTER A *BATSON* CHALLENGE WHEN THE STATE'S PROFFERED RACE-NEUTRAL REASON WAS FACIALLY DISCRIMINATORY, IF NOT PRE-TEXTUAL, AND THE COURT FAILED TO MAKE THE NECESSARY *BATSON* FINDINGS VIOLATING MARVAN'S EQUAL PROTECTION RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS, UNITED STATES CONSTITUTION; ARTICLE I, SECTION 2, OHIO CONSTITUTION.

IV.  TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL THROUGHOUT THE LITIGATION OF THIS CASE IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SECTION 10 ARTICLE 1 OF THE OHIO CONSTITUTION.

ASSIGNMENT OF ERROR I

{¶15} In his first assignment of error, appellant contends the trial court abused its discretion in denying his motion for a continuance.  He argues that the arbitrary denial of his motion for a continuance effectively denied his constitutional right to retain counsel of his choice and resulted in reversible structural error.  More specifically, he argues that it is reversible error for a trial court to arbitrarily deny a reasonable request for a continuance to retain counsel of choice.  The State responds by arguing that the trial court did not abuse its discretion in denying appellant's motion for a continuance and that no prejudice

resulted from the denial because just four days after denying appellant's request, the trial court continued the trial for nearly four months due to a last minute discovery issue that arose. Therefore, the State contends that appellant's arguments are wholly without merit.

Standard of Review

{¶16} Appellant contends the trial court abused its discretion in denying his motion for a continuance. In general, "[t]he grant or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge. An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion." *State v. Unger*, 67 Ohio St.2d 65, 67 (1981), citing *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964); *State v. Conway*, 2006-Ohio-791 ¶ 147; *State v. Jones*, 91 Ohio St.3d 335, 342 (2001). " '[A]buse of discretion' [means] an unreasonable, arbitrary, or unconscionable use of discretion, or * * * a view or action that no conscientious judge could honestly have taken.' " *State v. Kirkland*, 2014-Ohio-1966, ¶ 67, quoting *State v. Brady*, 2008-Ohio-4493, ¶ 23.

{¶17} A trial court that considers a motion to continue should "[w]eigh [ ] against any potential prejudice to the defendant * * * concerns such as a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice." *Unger* at 67. Therefore, when evaluating a request for a continuance, a court should also consider, inter alia:

the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons to whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.

*Id.* at 67-68.

Sixth Amendment Right to Counsel

{¶18} The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence." U.S. Const., Amend. VI.  The Supreme Court of Ohio has held as follows regarding the rights of an accused with respect to appointed counsel versus retained counsel:

> The right of an accused to select his own counsel is inherent only in those cases wherein such accused is employing the counsel himself.  The right to have counsel assigned by the court does not impose a duty on the court to allow the accused to choose his own counsel; the selection is within the discretion of the court. 23 C.J.S. Criminal Law § 982(5), p. 962.

*Thurston v. Maxwell*, 3 Ohio St.2d 92, 93 (1965).

{¶19} Decades later, the United States Supreme Court held as follows:

> While the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.

*Wheat v. United States*, 486 U.S. 153, 159 (1988).

{¶20} Then in 2006, the United States Supreme Court stated as follows:

> We have recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar. The court has, moreover, an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."

(Cleaned up.) *U.S. v. Gonzalez-Lopez*, 548 U.S. 140, 152 (2006), quoting *Wheat* at 160.

{¶21} In *U.S. v. Gonzales-Lopez*, the defendant was denied his choice of counsel as a result of the trial court's wrongful denial of an application for admission pro hac vice by the defendant's chosen counsel. *Id.* at 142.[2] In reaching its decision, the Court drew a distinction between "trial error" and "structural error." *Id.* at 148. The Court explained that while most constitutional errors constitute trial errors, some constitutional errors result in "structural defects." *Id.* The Court further explained that structural defects " 'defy analysis by "harmless-error" standards' because they 'affec[t] the framework within which the trial proceeds,' and are not 'simply an error in the trial process itself.' " *Id.*, quoting *Arizona v. Fulminante*, 499 U.S. 279, 309-310 (1991).

---

[2] The government did not dispute the circuit court's conclusion that the district court "erroneously deprived respondent of his counsel of choice." *Id*. at. 144.

{¶22} In a split decision, the majority of the *Gonzales-Lopez* Court concluded "that erroneous deprivation of the right to counsel of choice * * * unquestionably qualifies as 'structural error.' " *Gonzales-Lopez* at 150. However, *Gonzales-Lopez* factually differs from cases where an indigent defendant with appointed counsel seeks a continuance in order to substitute his appointed counsel with retained counsel and to allow newly retained counsel to have time to prepare for trial. It also factually differs from the facts of the case sub judice, where appellant, an indigent defendant, sought a continuance in order to try to secure additional funds to retain counsel of his choice. Importantly, *Gonzales-Lopez* acknowledged that "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them. *Id.* at 151, citing *Wheat v. U.S., supra*, at 159.

{¶23} Moreover, this Court has recently observed that the " ' "important right to counsel of choice is not absolute; it must be balanced against the court's authority to control its own docket," ' " and further " ' "a court must beware that a demand for counsel may be utilized as a way to delay proceedings or trifle with the court." ' " *State v. Thompkins*, 2024-Ohio-4927, ¶ 23 (4th Dist.), quoting *State v. Harmon*, 2005-Ohio-1974, ¶ 32 (4th Dist.), in turn quoting *United States v. Krzyske*, 836 F.2d 1013, 1017 (6th Cir. 1988).

Legal Analysis

{¶24} As set forth above, appellant contends that the trial court abused its discretion in denying his motion to continue the trial in order for him to retain hired counsel.  He further argues that in denying the motion, the trial court deprived him of his constitutional right to counsel of his choice.  He claims this deprivation resulted in structural error which does not require a showing of prejudice and which is not subject to a harmless error analysis.  Additionally, he alleges that the claimed structural error mandates an automatic reversal.

{¶25} This Court was recently confronted with arguments very similar to the ones raised by appellant in *State v. Thompkins, supra*.  Thompkins had court-appointed counsel but sought a continuance the morning of trial in order to substitute his appointed counsel with retained counsel.  *Id.* at ¶ 30.  In *Thompkins,* newly retained counsel actually appeared in court on the morning of trial and filed a "notice of conditional substitution of counsel."  *Id.*  Thompkins' newly retained counsel "conditioned the motion to be substituted as counsel for Thompkins on the trial court granting the motion for a continuance."  *Id.*  Thompkins argued that it had taken his family time to obtain the retainer and they had only obtained the funds required three days prior to the scheduled trial.  *Id.*  Newly retained counsel argued on Thompkins' behalf that Thompkins was "entitled to representation with counsel of his choice[,]" and that a continuance of 30 days was needed.  *Id.*

{¶26} This Court ultimately affirmed the trial court's denial of the motion for a continuance, finding the trial court did not abuse its discretion in denying the motion and further, that Thompkins had not been prejudiced by the denial of his motion. *Id.* at ¶ 33-35. In reaching our decision, we noted that Thompkins' motions were untimely filed, he had previously been granted continuances and previously had retained counsel that had withdrawn, that the jury was summoned for trial and witnesses were present, and that appointed counsel was ready to proceed. *Id.* at ¶ 34. We further found Thompkins had failed to demonstrate a conflict with appointed counsel and that the case had been pending for seven months. *Id.* We relied on our prior decision in *State v. Cobb*, 2007-Ohio-1885 (4th Dist.), where we overruled Cobb's argument "that the trial court erred when it denied his request for a continuance 'to enable privately retained counsel to substitute for appointed counsel[.]' " *Thompkins* at ¶ 25, quoting *Cobb* at ¶ 1. We noted that the trial court's decision was upheld in *Cobb* because Cobb's motion was untimely and a continuance would have resulted in an inconvenience. *Thompkins* at ¶ 25, citing *Cobb* at ¶ 15-16. We further noted that there was nothing in the record to indicate Cobb had a conflict with appointed counsel or that "his financial situation ha[d] changed since being appointed counsel." *Thompkins* at ¶ 25, citing *Cobb* at ¶ 18-20.

{¶27} Appellant argues that cases involving substitution of appointed counsel are different from cases involving a request to retain privately hired counsel of choice, and that cases involving requests to substitute counsel are inapplicable to the arguments raised in this appeal. However, we find cases analyzing the denial of a continuance for the purpose of substituting appointed counsel with retained counsel to be both applicable and instructive. *See State v. Thompkins, supra*; *State v. Cobb, supra*, at ¶ 11 ("Factors to consider in deciding whether a trial court erred in denying a defendant's motion to substitute counsel include the timeliness of the motion and whether there was a conflict between the attorney and the client that was so great that it resulted in a total lack of communication preventing an adequate defense"); *State v. Tingler*, 2022-Ohio-3792, ¶ 28 (4th Dist.) (overruling an argument that the trial court denied Tingler his Sixth Amendment right to counsel when it refused to permit him to retain counsel of his choice, and finding that Tingler was actually arguing that he was entitled to substitute counsel in place of his court-appointed counsel).

{¶28} The record before us indicates that on the Thursday before the Tuesday jury trial was scheduled to begin, appellant had not retained counsel because his family was still trying to obtain the funds required to pay a retainer fee. Thus, although appellant's family was trying to obtain the funds to hire counsel for appellant, we find that appellant himself remained indigent at the time of the

hearing and thus, he was not entitled to counsel of his choice. As such, we will review the decision of the trial court for an abuse of discretion in denying the motion for a continuance related to a request to substitute counsel. Further, we reject appellant's argument that the trial court's denial of his motion for a continuance effectively denied him his constitutional right to counsel of his choice, resulting in structural error.

{¶29} As set forth above, in considering whether to grant a motion to continue the trial, the relevant factors to consider by the trial court include: 1) the length of the delay requested; 2) whether other continuances have been requested and received; 3) the inconvenience to litigants, witnesses, opposing counsel and the court; 4) whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; 5) whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and 6) other relevant factors, depending on the unique facts of each case. *Unger* at 67-68.

{¶30} Here, the trial court stated on the records as follows in denying the motion for a continuance:

> No. This matter because of speedy trial issues is set for trial. The trial date has been on for quite a period of time. Your request to change counsel is way too late in the game. There is nobody that has been retained at this point or even indicated to the court that they are willing to take on this case. If you in – if you wish to hire somebody now, you can certainly do that but that attorney better be ready to go to trial next week. Understood?

* * *

Well, this isn't necessarily about your feelings. It is about the legal procedure that's before you. This matter has been set for quite some time. This is on the court's docket and you have had ample notice, ample opportunity to hire outside counsel, had you wished to do so previously and the court is not going to continue this on mere speculation.

{¶31} Appellant argues that the trial court did not properly apply the balancing test before denying his motion, arguing that despite the trial court's reference to speedy trial concerns, there was actually no speedy trial problem. Appellant further argues that the State did not object to the continuance and made no arguments regarding inconvenience. Appellant also contends that the trial court made no finding regarding whether the requested continuance was for purposes of delay. "This court has held, however, that 'nothing requires trial courts to specifically articulate an analysis of each *Unger* factor.' " *State v. Stevers*, 2023-Ohio-3050, ¶ 21 (4th Dist.), quoting *State v. Dickens*, 2009-Ohio-4541, ¶ 13 (4th Dist.); *Fultz v. Fultz*, 2014-Ohio-3344, ¶ 20 (4th Dist.). "Further, absent evidence to the contrary, we 'must presume that the trial court applied the law [in this case, the *Unger* factors] correctly.' " *Stevers* at ¶ 21, quoting *State v. Combs*, 18 Ohio St.3d 123, 125 (1985); *Hartt v. Munobe*, 67 Ohio St.3d 3, 7 (1993).

{¶32} Initially, we note that the trial court found that appellant's request was untimely. Although appellant's request was not made the morning of trial as in some cases, it was made just two and one-half business days prior to the start of

trial. With respect to the first *Unger* factor, which is the length of the delay requested, appellant requested 30 to 60 days, not for retained counsel to prepare for trial, but rather to allow his family to continue gathering money to retain a private attorney. The trial court stated that the case had been on the court's docket and had been set for trial for quite some time because of speedy trial issues. At that time, appellant had not waived his right to a speedy trial. Although appellant offered to waive his right to a speedy trial at that time, the court stated that it would not continue the case based upon "mere speculation," referencing the fact that no other attorney had been retained or had "indicated to the court that they are willing to take on the case." We find this *Unger* factor weighs in favor of appellee.

{¶33} With respect to the second *Unger* factor, which is whether other continuances have been requested and received, this factor weighs in favor of appellant. With respect to the third *Unger* factor, which considers the inconvenience to the litigants, witnesses, opposing counsel, and the court that would result from a continuance, we find this factor also weighs in favor of appellee. The trial court noted that the case had been on the court's docket and that the trial date had been on court's calendar "for quite a period of time." The record indicates that the May 9, 2023 trial date was set on February 21, 2023. The court also stated that appellant's request to change counsel was "way too late in the

game." As noted by the State, the request was made just two and one-half business days prior to the start of the trial.

{¶34} Although the State did not object to a continuance below, the State argues on appeal, and the record confirms, that the State had already issued over 20 subpoenas for trial witnesses. The court would have been aware of this fact as it was evident in the record. And again, the court was not required to specifically articulate its analysis of each factor. Appellant argues that because all but three of the State's witnesses were State employees, they would not have been inconvenienced by a reasonable continuance. However, this Court has reasoned that although a witnesses' presence might be required by their employment, "that does not diminish the inconvenience if the trial court continued the hearing." *Stevers* at ¶ 25, citing *State v. Colley*, 2010-Ohio-4834, ¶ 20 (4th Dist.) (continuance would have inconvenienced court, state, and various witnesses when request was made one business day before trial date).

{¶35} Regarding the fourth *Unger* factor, which considers whether the appellant's requested delay is for legitimate reasons or is dilatory, purposeful, or contrived, argues that the trial court did not find that the request was made for purposes of delay. While it is true that the trial court did not state it found appellant's motion to have been made for purposes of delay, the court did state that appellant's motion was untimely, that no attorney had contacted the court stating

they were willing to take on the case, and that appellant had been provided ample

notice of the trial date. Thus, although the trial court did not expressly find the

motion was a delay tactic, its findings suggest the trial court believed appellant had

waited until the last minute to request a continuance and that his ability to retain an

attorney was speculative, which we believe falls under the final factor, which

considers any other relevant factors unique to the case. Thus, although the fourth

factor arguably weighs in favor of appellant, the final factor weighs in favor of the

State.

{¶36} Although appellant contends that the trial court's denial of his motion

for a continuance was arbitrary and an abuse of discretion, we disagree. We

further find that despite appellant's stated dissatisfaction with his court-appointed

attorney, these particular facts did not support the need for substitute counsel. As

this Court recently noted in *State v. Thompkins*:

> "[f]actors to consider in deciding whether a trial court erred in
> denying a defendant's motion to substitute counsel include 'the
> timeliness of the motion; the adequacy of the court's inquiry into
> the defendant's complaint; and whether the conflict between the
> attorney and client was so great that it resulted in a total lack of
> communication preventing an adequate defense.' *United States
> v. Jennings*, 83 F.3d 145, 148 (6th Cir. 1996). In addition, courts
> should 'balanc[e] * * * the accused's right to counsel of his
> choice and the public's interest in the prompt and efficient
> administration of justice.' *Id*.; *State v. Jones*, 91 Ohio St.3d 335,
> 342-43, 744 N.E.2d 1163 (2001).

> Generally, a defendant bears the burden to demonstrate that substitute counsel is warranted.  *State v. Carter*, 128 Ohio App.3d 419, 423, 715 N.E.2d 223 (4th Dist.1998)."

*Thompkins* at ¶ 24, quoting *Tingler, supra*, at ¶ 18-19.

{¶37} Here, the trial court immediately noted that the motion was untimely. Further, when the trial court inquired into appellant's dissatisfaction with his court-appointed attorney, it was clear that his attorney had tried to visit him in the jail on at least two occasions, but that he was prevented from doing so once due to COVID, and another time due to the jail being on lock down.  Those difficulties cannot be attributed to appointed counsel, but rather, any attorney attempting contact with appellant would have encountered difficulty under those circumstances.  Moreover, appellant had apparently been able to reach his counsel because it was counsel who had requested the status conference on appellant's behalf so that he could make his pro se motion for a continuance.  Finally, the facts before us do not indicate that "the conflict between the attorney and client was so great that it resulted in a total lack of communication preventing an adequate defense."  *United States v. Jennings*, *supra*, at 148.

{¶38} We further find that appellant has failed to demonstrate that he suffered prejudice as a result of the trial court's denial of his motion.  As noted above, just four days after the trial court denied appellant's pro se request for a continuance, it granted his appointed counsel's request for a continuance due to

last minute discovery issues that arose on the fault of the State. The trial was continued nearly four months as a result. Thus, although appellant's pro se motion was denied, the trial was nevertheless continued. Appellant argues that he was still prejudiced because when the trial court denied his pro se motion, the money his family had gathered was "disbursed in less than a week." However, aside from appellant's allegation in his appellate briefing, that information is outside the record and not properly before us.

{¶39} In light of the foregoing, we find no merit to the arguments raised under appellant's first assignment of error. Therefore, it is overruled.

## ASSIGNMENT OF ERROR III

{¶40} We next address appellant's third assignment of error, out of order. In his third assignment of error, appellant contends that the trial court erred by excusing the only black venire person despite a *Batson* challenge being raised. Appellant argues that "the State's proffered race-neutral reason was facially discriminatory, if not pre-textual." Appellant further argues that the trial court failed to make the necessary *Batson* findings, resulting in a violation of his constitutional right to equal protection. The State responds by arguing that its peremptory challenges did not run afoul of either *Batson* or the Equal Protection Clause.

### *Batson v. Kentucky* Three-Step Test

{¶41} In 2022, the Supreme Court of Ohio observed as follows regarding

the test to be applied when a challenge is raised under *Batson v. Kentucky*, 476

U.S. 79 (1986):

> A defendant has "the right to be tried by a jury whose
> members are selected pursuant to nondiscriminatory criteria."
> [*Batson* at 85-86], 106 S.Ct. 1712. Accordingly, a constitutional
> violation occurs when the prosecution challenges "potential
> jurors solely on account of their race or on the assumption that
> black jurors as a group will be unable impartially to consider the
> State's case against a black defendant." *Id.* at 89, 106 S.Ct. 1712.
> "The Constitution forbids striking even a single prospective juror
> for a discriminatory purpose." *Flowers v. Mississippi*, 588 U.S.
> ——, 139 S.Ct. 2228, 2244, 204 L.Ed.2d 638 (2019).

> In *Batson*, the United States Supreme Court established a
> three-factor test for adjudicating race-based challenges. *Id.* at 96,
> 106 S.Ct. 1712. "First, the opponent of the peremptory challenge
> must make a prima facie case of racial discrimination." *State v.
> Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶
> 106. If the opponent satisfies that burden, "the burden shifts to
> the State to come forward with a neutral explanation for
> challenging black jurors." *Batson* at 97, 106 S.Ct. 1712. "At this
> step of the inquiry, the issue is the facial validity of the
> prosecutor's explanation." *Hernandez v. New York*, 500 U.S.
> 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). Although it
> is not enough to simply deny a discriminatory motive or assert
> good faith, *Batson* at 98, 106 S.Ct. 1712, the "explanation need
> not rise to the level justifying exercise of a challenge for cause,"
> *id.* at 97, 106 S.Ct. 1712.

> Finally, "the trial court must decide based on all the
> circumstances, whether the opponent has proved purposeful
> racial discrimination." *Bryan* at ¶ 106; *see also Batson*, 476 U.S.
> at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69. "The trial judge must
> determine whether the prosecutor's stated reasons were the actual
> reasons or instead were a pretext for discrimination." *Flowers* at
> ——, 139 S.Ct. at 2241. The court must "assess the plausibility

of the prosecutor's reason for striking the juror "in light of all evidence with a bearing on it." *Miller-El v. Dretke*, 545 U.S. 231, 252, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) ("*Miller-El II*"). Relevant factors may include "the prosecutor's demeanor; * * * how reasonable, or how improbable, the explanations are; and * * * whether the proffered rationale has some basis in accepted trial strategy." *Miller-El v. Cockrell*, 537 U.S. 322, 339, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) ("*Miller-El I*"). "In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's firsthand observations of even greater importance." *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008).

The trial court's finding at step three "is entitled to deference, since it turns largely 'on evaluation of credibility.' " *State v. White*, 85 Ohio St.3d 433, 437, 709 N.E.2d 140 (1999), quoting *Batson*, 476 U.S. at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69, fn. 21. Accordingly, "[a] trial court's findings of no discriminatory intent will not be reversed on appeal unless clearly erroneous." *Bryan* at ¶ 106; *see also Miller-El I* at 340, 123 S.Ct. 1029. If, however, a trial court does err in applying *Batson*, the error is structural. *See United States v. McFerron*, 163 F.3d 952, 955-956 (6th Cir.1998) (cataloging federal appellate courts that have unanimously and "resoundingly" rejected arguments that *Batson* errors are subject to harmless-error review).

*State v. Garrett*, 2022-Ohio-4218, ¶ 67-70.

Legal Analysis

{¶42} Here, during voir dire, the State informed the prospective jurors of the names of the defendant and the attorneys involved in the case, as well as a list of nine different law enforcement officers and other individuals that would be testifying. This was done in an effort to avoid a later conflict due to a juror being

close friends or family with one of the witnesses. The State engaged two different jurors regarding potential connections and ruled out possible conflicts. The State then inquired of Juror Number Five, Mr. Bayless, the sole black prospective juror, regarding an answer he included on his jury questionnaire. Mr. Bayless had stated on his questionnaire that he was "close friends or family" with Chillicothe Police Officer Darren Netter. The prosecutor made inquiries regarding this disclosure, explaining that he was unaware of any Chillicothe Police Officer by that name. During their conversation, Mr. Bayless, not the State, raised the question of whether or not Mr. Bayless might be related to the defendant. The exchange went as follows:

> MR. BAYLESS:   * * * I sorry – I have know [sic] idea about – or little to no idea about my family tree or whose [sic] where and whose [sic] where and what job they have. Which is – kind of puts into question of this particular case if I whether I know the defendant or not. Cause most of my family lives in this – in this county and in the State of Ohio.
>
> MR. MARKS:   Okay. So, you think there might be a familiar relationship?
>
> MR. BAYLESS:   There –
>
> MR. MARKS:   That's unknown to you at this point in time?
>
> MR. BAYLESS:   At this point in time, yes.
>
> MR. MARKS:   Okay.

MR. BAYLESS:    Mostly, the only two people I know who would probably know is my father and my grandfather, but unfortunately, my grandfather passed away.

{¶43} Based upon this exchange, the State raised a peremptory challenge to Juror Number Five. In turn, defense counsel raised a challenge to the removal of Juror Number Five, stating that there had been no reasonable explanation given for his removal and noting that he was "the only African American in the room" besides appellant. The State then argued as follows:

I don't disagree with the second part of that, but with respect to the first part, when asked if he knew of anyone including Mr. Woodfork, he gave a very roundabout answer saying that he obviously has family in Chillicothe and Ross County, like most of the jurors would, and then indicated that he may or may not be related to Mr. Woodfork because of the name. He would have to check with his father to see that. So, that would be the basis for the peremptory on that.

In response, the trial court stated, almost as a continuation of the end of the State's statement, that the basis for the peremptory challenge "would be sufficient enough to overcome the (not audible) and challenge." The trial court then asked if there was anything further. Defense counsel did not offer anything additional. The State then formally excused Juror Number Five, as well as the replacement juror that took his place.

{¶44} Appellant first argues that the State used only one peremptory challenge and that was to eject the only black person. However, the record reveals

that the State used a peremptory challenge to remove not only Mr. Bayless, but also another juror. Appellant also argues that defense counsel was not permitted an opportunity to demonstrate that the explanation given was pretextual. However, as set forth above, the court asked if there was anything further, but defense counsel did not add any additional comment.

{¶45} Appellant cites *New Mexico v. Aragon*, 109 N.M. 197, 198 (N.M. 1989) in further support of his arguments. In *Aragon*, it was found that the trial court simply "rubber stamped" the prosecutor's explanation for a peremptory challenge, which was based upon nothing more than the prosecutor's own statement that there was a possible blood relationship between two potential black jurors and a black defendant in another case pending before the court, not with Aragon. *Aragon* at 202. Further, in *Aragon*, the prosecutor asked no questions of the potential jurors during voir dire, and the trial court did not inquire into the prosecutor's basis for his explanation. *Id.* Appellant suggests that as in *Aragon*, the trial court here also simply "rubber-stamped" the State's proffered race-neutral explanation.

{¶46} Here, however, it was not the State that suggested there was a family relationship between appellant and Mr. Bayless, it was Mr. Bayless who raised that concern and persisted in that concern, essentially stating he could not rule it out without speaking to his father. Appellant specifically finds fault with the State's

explanation that Mr. Bayless believed he may have been related to appellant "because of the name." It is true that when the defense raised a *Batson* challenge to the removal of Mr. Bayless, the State incorrectly summarized its previous exchange with the juror to the extent that the juror's concern about a family relationship was "because of the name." Mr. Bayless did not mention anything about appellant's name, however, he did state that he was not familiar with his family tree and that most of his family lived in the area. As such, he was concerned there was a family relationship that he would not be able to rule out without speaking with his father. The trial court accepted that explanation and found that it was sufficient to overcome the challenge raised by the defense. Although there is a critical part of the transcript that was inaudible, we presume the regularity of the record and find that the trial court stated that the State's basis for the removal of the juror was sufficient to overcome either the *Batson* challenge, or the defense's challenge.

{¶47} Additionally, we agree with the State's argument that this case is similar to *State v. Fairrow*, 2004-Ohio-3145 (4th Dist.). In *Fairrow*, an African-American juror was excused because her mother was "good friends with the defendant's mother." *Id.* at ¶ 4. The court found that reason to be race-neutral and overruled the objection to the peremptory challenge. *Id.* On appeal, this Court upheld the trial court's decision, finding that "[a] juror's self-professed familiarity

with the defendant or his family and the resulting discomfort in deciding his fate were race neutral reasons for exclusion." *Id.* at ¶ 15.  Here, we find that Mr. Bayless's volunteered statement of concern that he might be related to appellant, coupled with his statement that most of his family was from the area and that he was not familiar with his family tree, constituted a race-neutral explanation. Therefore, we conclude the trial court did not err in overruling the objection to the peremptory challenge.  Thus, we find no *Batson* violation occurred.  Accordingly, because we find no merit to the arguments raised, Appellant's third assignment of error is overruled.

## ASSIGNMENT OF ERROR II

{¶48} In his second assignment of error, appellant contends that the trial court abused its discretion and committed prejudicial error in refusing to instruct the jury on the inferior degree and lesser included offenses of murder and felony murder.  More specifically, appellant argues the evidence demonstrated that sufficient provocation by the decedent was present, justifying a jury instruction on voluntary manslaughter as the inferior degree offense of murder, and involuntary manslaughter as the lesser included offense of felony murder, with aggravated assault, an inferior degree offense of felonious assault, serving as the predicate felony.  The State responds by arguing that there was simply no evidence of a

sudden fit of passion or rage brought on by the victim's serious provocation and that the trial court did not abuse its discretion in denying the requested instructions.

Standard of Review

{¶49} We initially note "that a trial court must fully and completely give jury instructions which are relevant and necessary in order for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Waugh*, 1994 WL 71228, *2 (4th Dist. Mar. 2, 1994), citing *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. "When the indictment * * * charges an offense, including different degrees, or if other offenses are included within the offense charged, the jury may find the defendant not guilty of the degree charged but guilty of an inferior degree thereof or lesser included offense." R.C. 2945.74; *see also* Crim.R. 31(C). "The question of whether a particular offense should be submitted to the finder of fact as a lesser included offense involves a two-tiered analysis." *State v. Deanda*, 2013-Ohio-1722, ¶ 6.

{¶50} "The first tier, also called the 'statutory-elements step,' is a purely legal question, wherein we determine whether one offense is generally a lesser included offense of the charged offense[,]" or an inferior degree offense of the charged offense. *Id*., quoting *State v. Kidder*, 32 Ohio St.3d 279, 281 (1987). "The test used to determine whether to instruct a jury on an offense of inferior degree is the same test used to determine whether to instruct a jury on a lesser

included offense." *Waugh, supra,* at *2, citing *Shane* at 632.  In making the

determination whether an offense is a lesser included offense,

> a court shall consider whether one offense carries a greater penalty than the other, whether some element of the greater offense is not required to prove commission of the lesser offense, and whether the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed.

*State v. Evans*, 2009-Ohio-2974, paragraph two of the syllabus, clarifying *State v. Deem*, 40 Ohio St.3d 205 (1988).  In contrast, the elements of an inferior degree offense are "* * * contained within the indicted offense, except for one or more additional mitigating elements * * *."  *State v. Shane*, 63 Ohio St.3d 630, 632 (1992).  If this test is met, then the offense in question is a lesser included offense or an inferior degree offense of the indicted offense.

{¶51} "The second tier looks to the evidence in a particular case and determines whether ' "a jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense[,]" ' " or an inferior degree offense.  *Deanda* at ¶ 6, quoting *Evans* at ¶ 13, in turn quoting *Shaker Hts. v. Mosely*, 2007-Ohio-2072, ¶ 11.  "The trial court has discretion in determining whether the record contains sufficient evidentiary support to warrant a jury instruction on the lesser-included offense, and we will not reverse that determination absent an abuse of discretion."  *State v. Blanton*, 2018-Ohio-1278, ¶ 64 (4th Dist.).  However, while "the discretion of the trial judge play[s] a

role in whether lesser-included-offense instructions are appropriate * * * the evidence is crucial[.]" *State v. Wine*, 2014-Ohio-3948, ¶ 21.  " '[T]he trial court must view the evidence in the light most favorable to the defendant.' " *Id.*, quoting *State v. Monroe*, 2005-Ohio-2282, ¶ 37.

{¶52} An instruction on a lesser included offense "is not warranted every time 'some evidence' is presented to support the lesser offense." *State v. Trimble*, 2009-Ohio-2961, ¶ 192, citing *State v. Shane*, *supra*, at 632.  "Rather, a court must find 'sufficient evidence' to 'allow a jury to *reasonably* reject the greater offense and find the defendant guilty on a lesser included (or inferior degree) offense.' " (Emphasis in *Shane*) *Id.*, quoting *Shane* 632-633.  "The trial court must give an instruction on a lesser included offense if under any reasonable view of the evidence it is possible for the trier of fact to find the defendant not guilty of the greater offense and guilty of the lesser offense." *Wine* at ¶ 34.  "To require an instruction * * * every time 'some evidence,' however minute, is presented going to a lesser-included (or inferior-degree) offense would mean that no trial judge could ever refuse to give an instruction on a lesser included (or inferior-degree) offense." *State v. Grube,* 2013-Ohio-692, ¶ 76 (4th Dist.), quoting *Shane* at 633.

Legal Analysis

{¶53} Appellant was charged in Count One with murder, a special felony in violation of R.C. 2903.02(A).  R.C. 2903.02(A) provides that "[n]o person shall

purposely cause the death of another." R.C. 2903.03(A) defines the offense of voluntary manslaughter and provides, in pertinent part, as follows:

> No person, while under the influence of sudden passion or in a sudden fit or rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *.

This Court has previously determined that voluntary manslaughter is an inferior degree offense of murder, meaning that the elements of voluntary manslaughter are contained within the offense of murder, except for one or more additional mitigating elements are required to be proven to establish the offense of voluntary manslaughter. *State v. Blevins*, 2019-Ohio-2744, ¶ 32 (4th Dist.), citing *State v. Goff*, 2013-Ohio-42, ¶ 46 (4th Dist.); *State v. Alexander*, 2009-Ohio-1401 ¶ 62 (4th Dist.). *Accord State v. Shane, supra*, at 632. Appellant argues he was entitled to a jury instruction on the inferior degree offense of voluntary manslaughter with respect to the murder charge.

{¶54} This Court has determined that a defendant on trial for murder "bears the burden of persuading the fact finder, by a preponderance of the evidence, that he or she acted under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force, R.C. 2903.03(A), in order for the defendant to be convicted of voluntary manslaughter

rather than murder * * *." *Blevins, supra*, at ¶ 32, quoting *State v. Goff, supra*, at ¶ 46. Further, as explained in both *Blevins* and *Goff*, " 'when a voluntary manslaughter instruction is appropriate, a trial court should instruct the jury "to consider the mitigating evidence to determine whether [the defendant] proved voluntary manslaughter.' " *Blevins* at ¶ 32, quoting *Goff* at ¶ 47. *See also State v. Benge*, 75 Ohio St.3d 136, 140-141 (1996).

{¶55} Count Two of the indictment charged Appellant with felony murder, a special felony in violation of R.C. 2903.02(B), which states that:

> No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

The predicate felony set forth in the indictment was felonious assault. R.C. 2903.11 governs the offense of felonious assault and states, in pertinent part, that no person shall cause serious physical harm to another by means of a deadly weapon.

{¶56} Regarding the felony murder charge, appellant argues he was entitled to a jury instruction on the lesser included offense of involuntary manslaughter with the predicate felony being aggravated assault. R.C. 2903.04 defines the offense of involuntary manslaughter and states in relevant part in section (A) that "[n]o person shall cause the death of another * * * as a proximate result of the

offender's committing or attempting to commit a felony." Aggravated assault is defined in R.C. 2903.12 which provides, in pertinent part, as follows:

(A)   No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly:

(1)   Cause serious physical harm to another or to another's unborn[.]

This Court has determined that involuntary manslaughter is a lesser included offense of felony murder. *See State v. Wilson*, 2018-Ohio-2700, ¶ 50 (4th Dist.). *See also State v. Wadlington*, 2024-Ohio-1268, ¶ 36 (8th Dist.), citing *State v. Thomas*, 40 Ohio St.3d 213, 215 (1988). Moreover, aggravated assault is an inferior degree offense of felonious assault. *Wadlington* at ¶ 35, citing *State v. Martin*, 2018-Ohio-1098, ¶ 8 (8th Dist.).

{¶57} Therefore, all of appellant's requested instructions satisfied the first tier of the test in that they were all either lesser included, or inferior degree, offenses of the indicted offenses. However, under the second tier of the test, in order for appellant to be entitled to a jury instruction on the inferior degree offense of voluntary manslaughter with respect to the murder charge, as well as an instruction on the lesser included offense of involuntary manslaughter with respect to the felony murder charge, there had to be sufficient evidence in the record that appellant acted under the influence of sudden passion or in a sudden fit of rage,

either of which was brought on by the serious provocation occasioned by the victim, which was reasonably sufficient to incite appellant into using deadly force.

{¶58} Again, the second tier of the test considers the evidence in a particular case and determines whether the jury could have reasonably found the defendant not guilty of the offenses charged, and instead could have convicted the defendant of the lesser included offense and/or inferior degree offenses. *See Deanda*, *supra,* at ¶ 6; *Evans*, *supra*, at ¶ 13; *Mosely*, *supra,* at ¶ 11. We explained in *Blevins, supra*, that in order for instructions on lesser included offenses (and/or inferior degree offenses) to be given, there is a requirement for both objective and subjective evidence. *Blevins* at ¶ 34, citing *Goff* at ¶ 50.

{¶59} For instance, we have explained that in order for a voluntary manslaughter instruction to be given, the following must be demonstrated:

> Appellant first had to show "evidence of reasonably sufficient provocation occasioned by the victim * * * to warrant such an instruction." *Goff* at ¶ 50; quoting *Shane* at 630, 590 N.E.2d 272. This determination is to be made using an objective standard. *Goff* at ¶50. For example, we have explained that " '[f]or provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control.' " *Id*.; quoting *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶81; in turn quoting *Shane* at 635, 590 N.E.2d 272. If the objective component is satisfied, the inquiry then "shifts to the subjective component, which considers whether this particular actor, in this particular case, was actually under the influence of sudden passion, or was in a sudden fit of rage." *Goff* at ¶ 51; citing *Shane* at 634, 590 N.E.2d 272.

*Blevins* at ¶ 34.

On the other hand, in both *Blevins* and *Goff*, this Court explained that in analyzing the subjective component of the test, evidence that the defendant feared for his own or another's personal safety, as required for self-defense, does not constitute a sudden passion or a fit of rage, as required by the voluntary manslaughter statute. *Blevins* at ¶ 35; *Goff* at ¶ 52. *See also State v. Levett*, 2006-Ohio-2222, ¶ 29 (1st Dist.), quoting *State v. Perdue*, 2003-Ohio-3481, ¶ 12 (7th Dist.), in turn quoting State v. *Harris* 129 Ohio App.3d 527, 535 (10th Dist. 1998).

{¶60} Appellant argues, with respect to the second tier, that when viewed in a light most favorable to him, the evidence supported an acquittal of murder and felony murder, and a conviction of the lesser included and inferior degree charges. In support of his argument, appellant asserts that he and his companion, Kayleigh Horn, sought refuge in a hotel room while receiving death threats from appellant, threats which he claims he had been receiving for six to seven months. He points to evidence that the victim tracked them down at the hotel, and after he was unable to determine what room they were in after checking with the office, the victim went back to his car where "he continued to verbally threaten the pair with death." Appellant contends this evidence constituted sufficient evidence to support an instruction on the inferior degree offense of voluntary manslaughter, and the lesser

included offense of involuntary manslaughter predicated upon the offense of aggravated assault.

{¶61} In further support of his argument, he cites a study which he claims stands for the proposition that the feelings of fear and anger are not mutually exclusive, but instead they often overlap and frequently arise simultaneously. He contends that with these instructions, the jury would have been able to determine whether "the evidence supported a finding that [he] acted under a sudden passion or in a sudden fit of rage brought on by the serious provocation of [the victim]." However, this Court has noted the distinction between fear and rage, explaining that a showing of fear is necessary for a claim of self-defense, while voluntary manslaughter requires a showing of rage. *See State v. Rizer*, 2011-Ohio-5702, ¶ 37 (4th Dist.).

{¶62} Further, in *Blevins*, after assuming the objective component of the test had been met, this Court found that the appellant's testimony that he was frightened by threats made by the victim towards him in the days leading up to the incident, and that he had shot the victim out of fear because he was afraid that if he didn't shoot, the victim would shoot first, did not constitute evidence that the appellant acted under the influence of sudden passion or in a sudden fit of rage. *Blevins* at ¶ 36. Thus, we determined that there was insufficient evidence introduced at trial to warrant a voluntary manslaughter instruction. *Id. See also*

*State v. Loy*, 2021-Ohio-403, ¶ 20 (4th Dist.) ("[E]vidence that a defendant feared for the safety of himself or another 'does not constitute sudden passion or a fit of rage as contemplated by the voluntary manslaughter statute.' "), quoting *State v. Sudderth*, 2008-Ohio-5115, ¶ 14 (4th Dist.); *see also State v. Mack*, 82 Ohio St.3d 198, 201 (1998) ("Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or [a] fit of rage.").

{¶63} Appellant contends that the trial court's role was limited to determining whether sufficient evidence of provocation was present to support an instruction on these lesser included and inferior degree offenses, and that it erred in going further by weighing the evidence, assessing credibility, and substituting its own judgment as to whether the provocation was serious enough to cause appellant to act under a sudden fit of passion or rage, thereby usurping the role of the jury. Appellant particularly argues that in reaching its decision, the trial court arbitrarily ignored the fact that the threats were not passive or isolated, but instead were made for months leading up to the victim tracking appellant down and continuing to threaten him. Appellant further contends the trial court erroneously applied the "words alone doctrine" to deny the requested instructions, rather than allowing the jury to determine whether the provocation was enough to cause appellant to act under a sudden fit of passion or rage. Appellant also asserts that the trial court did

not engage in the required analysis regarding the request for the involuntary manslaughter instruction.

{¶64} However, we find no error or abuse of discretion in the trial court's findings. In denying the request for the voluntary manslaughter instruction, the trial court cited to the evidence in the record indicating that appellant acted out of fear for himself and for Horn. Thus, even assuming arguendo that there was sufficient provocation on the victim's part which would have incited an ordinary person to passion and rage resulting in the use of deadly force, there is simply no evidence in this particular record that appellant acted out of anything but fear. Again, when asked why he shot the victim, appellant stated that it was because he was afraid. Thus, even if we were to find that the provocation was sufficient and that the objective prong of the second tier of the test was met, the subjective prong of the test was not satisfied.

{¶65} The same analysis applies to the request for an involuntary manslaughter instruction, although the court applied a more limited analysis to that request. The trial court simply found that no reasonable jury could acquit on the felonious assault charge as the predicate offense, in favor of convicting on the inferior degree offense of aggravated assault. We agree with the trial court's reasoning in light of its earlier finding that there was no evidence in the record that appellant acted under the influence of passion or upon a sudden fit of rage.

Without evidence that appellant acted under the influence of sudden passion or in a sudden fit of rage, a reasonable jury could not have acquitted appellant of felony murder/felonious assault and instead convicted him of involuntary manslaughter/aggravated assault.

{¶66} We further find no error with respect to the trial court's mention of the words alone doctrine. In *State v. Shane, supra*, in paragraph two of the syllabus, the Supreme Court of Ohio held that "[w]ords alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations." The trial court's reference to this holding in denying the requested instructions was a correct statement of the law. The trial court then went on to specifically find that appellant's statement to police that he was afraid, or that he feared for his life, in this situation "did not constitute evidence that the defendant acted under a sudden passion or fit of rage to support a jury instruction on voluntary manslaughter." We agree with this finding, which is essentially dispositive of the question of whether appellant was entitled to the requested instructions. As such, we find no abuse of discretion on the part of the trial court in denying the requested instructions. Because we find no merit to the arguments raised under appellant's second assignment of error, it is overruled.

ASSIGNMENT OF ERROR IV

{¶67} In his fourth assignment of error, appellant contends that his trial counsel provided ineffective assistance of counsel throughout the litigation of this case in violation of his constitutional right to counsel. More specifically, he argues that counsel's deficient performance lacked any semblance of trial strategy and fell far below prevailing professional norms. He sets forth several alleged examples of his counsel's ineffectiveness and he urges this Court to consider the cumulative errors of counsel in our analysis. The State responds by arguing that appellant received effective assistance of counsel and has failed to demonstrate that he was prejudiced by any of counsel's alleged errors.

Standard of Review

{¶68} The Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense. The United States Supreme Court has generally interpreted this provision to mean a criminal defendant is entitled to the "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984).

{¶69} To establish constitutionally ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was deficient and (2) the deficient performance prejudiced the defense and deprived the defendant of a fair trial. *See Strickland, supra*, at 687; *State v. Myers*, 2018-Ohio-1903, ¶ 183; *State v.*

*Powell*, 2012-Ohio-2577, ¶ 85. "Failure to establish either element is fatal to the claim." *State v. Jones*, 2008-Ohio-968, ¶ 14 (4th Dist.). Moreover, if one element is dispositive, a court need not analyze both. *State v. Madrigal*, 87 Ohio St.3d 378, 389.

{¶70} The deficient performance part of an ineffectiveness claim "is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' " *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010), quoting *Strickland*, *supra*, at 688. Prevailing professional norms dictate that "a lawyer must have 'full authority to manage the conduct of the trial.' " *State v. Pasqualone*, 2009-Ohio-315, ¶ 24, quoting *Taylor v. Illinois*, 484 U.S. 400, 418 (1988).

{¶71} Further, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, *supra*, at 688. Accordingly, "[i]n order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation." (Citations omitted.) *State v. Conway*, 2006-Ohio-2815, ¶ 95. In addition, when considering whether trial counsel's representation amounts to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."

*Strickland, supra*, at 689. Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* Additionally, "[a] properly licensed attorney is presumed to execute his duties in an ethical and competent manner." *State v. Taylor*, 2008-Ohio-482, ¶ 10 (4th Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 100 (1985). Therefore, a defendant bears the burden of showing ineffectiveness by demonstrating that counsel's errors were "so serious" that counsel failed to function "as the 'counsel' guaranteed * * * by the Sixth Amendment." *Strickland*, *supra*, at 687; *e.g., State v. Gondor*, 2006-Ohio-6679, ¶ 62; *State v. Hamblin*, 37 Ohio St.3d 153, 156 (1988).

{¶72} To establish prejudice, a defendant must demonstrate that a reasonable probability exists that "but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the outcome." *Strickland, supra*, at 694; *e.g., State v. Short*, 2011-Ohio-3641, ¶ 113; *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus; *accord State v. Spaulding*, 2016-Ohio-8126, ¶ 91 (prejudice component requires a "but for" analysis). "[T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland, supra*, at 695. Further, courts ordinarily may not simply presume the existence of prejudice but must require a

defendant to establish prejudice affirmatively. *State v. Clark*, 2003-Ohio-1707, ¶ 22 (4th Dist.).

{¶73} Moreover, we have recognized that speculation is insufficient to establish the prejudice component of an ineffective assistance of counsel claim. *E.g., State v. Tabor*, 2017-Ohio-8656, ¶ 34 (4th Dist.); *State v. Jenkins*, 2014-Ohio-3123, ¶ 22 (4th Dist.); *State v. Simmons*, 2013-Ohio-2890, ¶ 25 (4th Dist.); *State v. Halley*, 2012-Ohio-1625, ¶ 25 (4th Dist.); *State v. Leonard*, 2009-Ohio-6191, ¶ 68 (4th Dist.); *accord State v. Powell*, 2012-Ohio-2577, ¶ 86.

Legal Analysis

A. Failure to Provide Assistance of Counsel in Obtaining a Continuance

{¶74} Appellant contends that he "was left without the assistance of counsel when he moved for a continuance to retain counsel of his choice." He argues that his request for a continuance was made in part because of his "inability to effectively communicate with his appointed counsel." He argues that under the Ohio Rules of Professional Conduct, his counsel was required to consult with him and that instead of "aiding [him] in his legal objectives, counsel did nothing." Appellant further argues that counsel did not file a motion for a continuance on his behalf, but rather that appellant had to appear remotely and present his request for a continuance to retain counsel "while counsel stood by idly." He also argues that counsel should have objected to the trial court's denial of the motion for a

continuance on speedy trial grounds, reasoning which he argues was fundamentally flawed.

{¶75} We find no merit to appellant's arguments.  Contrary to Appellant's argument that counsel failed to aid him in his request for a continuance, the record demonstrates that counsel immediately brought appellant's request to the court's attention and a hearing was specifically held just days prior to the start of trial in order for Appellant to make his pro se request.  Because appellant's request for a continuance was grounded in his dissatisfaction with his appointed counsel as well as his desire to be permitted additional time to gather funds to retain counsel, we find defense counsel's decision to simply stand by while appellant communicated his desires directly to the court to be reasonable under the circumstances.

{¶76} As noted in our disposition of appellant's first assignment of error, the trial court set forth additional reasonable grounds for the denial of appellant's motion, aside from speedy trial concerns.  As such, we have already found that the trial court did not abuse its discretion in denying appellant's pro se motion. Further, considering that just days after appellant's motion was denied, the trial was continued for several months at the request of defense counsel on other grounds, appellant cannot demonstrate he was prejudiced by the assistance rendered by counsel during the hearing on the motion for a continuance. Therefore, we find no merit to these arguments.

## B. Failure to file a Motion to Suppress

{¶77} Appellant next contends that defense counsel provided ineffective assistance of counsel by failing to file a motion to suppress his confession. Appellant argues that "[t]here were facts available that indicate his privilege against self-incrimination was not waived voluntarily." More specifically, he argues that the *Miranda* warnings provided were not presented in writing nor signed by him, and that the officer informing him of his rights "mumbled." He argues there was no discussion regarding whether he could read or write English, his level of education, any mental or physical defects affecting his understanding, or whether he was under the influence of any alcohol or drugs.

{¶78} In support of his arguments, Appellant references the fact that during his interview, he was unsure of the day of the week, was offered cigarettes, pizza, and Mountain Dew to induce his cooperation in locating the firearm that was used in the commission of the offense, and was persuaded to cooperate with a promise that law enforcement "did not care about the tampering charges." The State responds by arguing that there was no basis for the filing of a motion to suppress as appellant was properly *Mirandized* and then voluntarily spoke to law enforcement.

{¶79} "Counsel's failure to file a motion to suppress is not per se ineffective assistance of counsel." *State v. Thompkins*, 2024-Ohio-4927, ¶ 66 (4th), citing *State v. Walters*, 2013-Ohio-772, ¶ 20 (4th Dist.), in turn citing *State v. Madrigal*,

87 Ohio St.3d 378, 389 (2000). Rather, " 'the failure to file a motion to suppress amounts to ineffective assistance of counsel only when the record demonstrates that the motion would have been successful if made.' " *Thompkins* at ¶ 66, quoting *State v. Resendiz*, 2009-Ohio-6177, ¶ 29 (12th Dist.). Further, "we are to presume that trial counsel was effective if he could have reasonably decided that filing a motion to suppress would be a futile act, even if there is some evidence in the record to support a motion." *Walters* at ¶ 20, citing *Resendiz* at ¶ 29.

{¶80} " 'A suspect's incriminatory statements ordinarily are admissible ... if law enforcement officers gave the suspect the *Miranda* warnings and if the suspect implicitly or explicitly waived the Fifth Amendment right against self-incrimination.' " *State v. Pleasant*, 2025-Ohio-115, ¶ 72 (4th Dist.), quoting *State v. Neal*, 2015-Ohio-5452, ¶ 24 (4th Dist.), citing *Berghuis v. Thompkins*, 560 U.S. 370, 395 (2010). " 'If a defendant later challenges incriminating statements as involuntary, "the state must prove a knowing, intelligent, and voluntary waiver by a preponderance of evidence." ' " *Pleasant* at ¶ 72, quoting *Neal* at ¶ 24, in turn quoting *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 34. Voluntariness "is determined by 'the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.' " *State v. Garrett*, 2022-

Ohio-4218, ¶ 101, quoting *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, vacated in part on other grounds, *Edwards v. Ohio*, 438 U.S. 911 (1978).  "A waiver will not be deemed to be involuntary '*unless* there is evidence of police coercion, such as physical abuse, threats, or deprivation of food, medical treatment, or sleep.' "  (Emphasis in original.) *Garrett* at ¶ 101, quoting *Wesson* at ¶ 35.  Moreover, contrary to appellant's argument that appellant's *Miranda* rights were not presented to him in writing nor waived by him in writing, "there is no requirement that a waiver be written."  *In re T.D.S.*, 2024-Ohio-595, ¶ 19 (rejecting an argument that a waiver was not knowing, intelligent, and voluntary where no written *Miranda* warnings were provided and where the waiver was not in writing).

{¶81} Here, appellant's interview with law enforcement was videotaped and the interviewing officer can clearly be heard providing appellant with his *Miranda* warnings.  When asked if he understood his rights, appellant said he did.  He also clearly agreed to speak with law enforcement despite just having been advised he had the right to remain silent and also had the right to an attorney.  He, at all times, was spoken to in English and responded in English.  There is no indication from the video that appellant exhibited any signs of a mental defect, other than briefly being uncertain regarding the day of the week.

{¶82} Law enforcement called appellant by the name of "Snoop" during the interview and it was clear they were familiar with each other. The interviewing officer even knew appellant's mother's first name when appellant noted that his mother had rented the room at the Christopher Inn. Further, there is evidence in the record that this was not appellant's first involvement with law enforcement. Additionally, with respect to law enforcement's offer of food and drink if appellant would assist in locating the missing firearm, that offer was made only after appellant stated he wanted a cigarette, and after appellant had already voluntarily confessed to shooting the victim. In response, law enforcement offered him not only a cigarette, but also pizza and Mountain Dew if he would aid them in finding the firearm. At the time refreshments and a cigarette were offered, the interrogation had only been going on for a short time, less than an hour.

{¶83} Viewing the totality of the evidence contained in the record, we believe it was reasonable for trial counsel to conclude that filing a motion to suppress would be futile. Thus, we cannot conclude that counsel rendered ineffective assistance by virtue of failing to seek suppression of appellant's confession. Accordingly, we find no merit to this argument.

### C. Failure to Effectively Raise a *Batson* Challenge

{¶84} Appellant also contends that his counsel was ineffective for failing to raise an effective *Batson* challenge. While he acknowledges that counsel did raise

a challenge to the State's peremptory strike of the only black juror in the jury pool, he argues that counsel fell short by failing "to ensure that the trial court engaged in a complete *Batson* analysis and failed to submit the State's proffered race-neutral argument to effective adversarial testing." He claims that his counsel should have challenged the proffered race-neutral reason for the strike because "the State falsely claimed that Mr. Bayless believed he had a familiar relationship to Marvan because of his name."

{¶85} "A trial court's determination that the state did not possess discriminatory intent in the exercise of its peremptory challenges will not be reversed on appeal unless it was clearly erroneous." *State v. May*, 2015-Ohio-4275, ¶ 45 (8th Dist.), citing *State v. Strong*, 2015-Ohio-169, ¶ 14 (8th Dist.), in turn citing *State v. Hernandez*, 63 Ohio St.3d 577, 583 (1992). We have already rejected appellant's argument that the trial court erred by granting the State's peremptory strike of the only black juror. In reaching our decision, we acknowledged that the State incorrectly summarized its previous exchange with the juror to the extent that the juror's concern about a family relationship was "because of the name." We noted that although Mr. Bayless did not mention anything about appellant's name, he did state that he was not familiar with his family tree and that most of his family lived in the area. As such, he was concerned there was a family relationship that he would not be able to rule out without speaking with his father.

When questioned further by the State, Mr. Bayless persisted in his concern. This led the State to make a peremptory challenge.

{¶86} In response to appellant's *Batson* challenge, the State referenced the concerns brought up by Mr. Bayless during voir dire. The trial court accepted the explanation and found that it was sufficient to overcome the challenge raised by the defense. This determination by the trial court was not clearly erroneous. Having found no error in the trial court's granting of the State's peremptory strike, we cannot now conclude that defense counsel was deficient in failing to more strenuously object to the trial court's ruling, or in failing to point out to the court that Mr. Bayless's concern was not rooted in having the same name as appellant. Accordingly, this argument is without merit and is overruled.

### D. Failure to Challenge Kayleigh Horn's Inadmissible Hearsay Statements that Violated the Confrontation Clause

{¶87} The record reveals that Chillicothe Police Officer, Matthew Shipley, along with Detective Adam Steele, were the first officers to arrive at the scene that night. They arrived to find the victim lying on the ground with apparent gunshot wounds, and with Kayleigh Horn standing nearby. As Officer Steele provided aid to the victim while waiting for EMS to arrive, Officer Shipley marked off a perimeter. After Detective Steele quickly worked to photograph the victim's injuries before EMS transported him to the hospital, he asked Horn who shot the victim.

{¶88} Defense counsel objected on hearsay grounds, to which the State responded that the statement was admissible as an excited utterance. The court then permitted the State to lay a foundation that established that Horn was distraught and breathing heavily, was crying, and was noticeably shaking. Defense counsel then renewed his objection, which was overruled by the trial court. Steele then testified that when he asked Horn if "Snoop" had been the one that shot the victim, Horn "shook her head yes." Detective Steele then testified that he "relayed the information to a responding units [sic] around the – that responded to the scene. We already knew from other witnesses that the subject, Mr. Woodfork, had ran southbound across 35, U.S. 35, towards the woodline by Centerpoint Church."

{¶89} Appellant concedes that his trial counsel objected to the admission of this statement upon hearsay grounds, but contends that he should have further argued that admission of the statement constituted a testimonial statement, the admission of which violated the Confrontation Clause. The State contends that the statement was nontestimonial and, therefore, there was no violation of the Confrontation Clause. In support of its argument, the State asserts that Detective Steele asked Horn for the identity of the shooter "as a public safety measure and in an effort to apprehend the suspect." For the following reasons, we agree that the statement at issue constituted a nontestimonial statement and that its admission did not violate the Confrontation Clause.

{¶90} The Supreme Court of Ohio recently explained as follows, relevant to these arguments:

> The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court explained that the key question for determining whether a Confrontation Clause violation has occurred is whether an out-of-court statement is "testimonial." *Id.* at 59, 68, 124 S.Ct. 1354. If a statement is testimonial, its admission into evidence will violate the defendant's right to confrontation if the defendant does not have an opportunity to cross-examine the declarant. *Id.* at 53-56, 124 S.Ct. 1354.
>
> To determine whether a statement is testimonial, courts must look to post-*Crawford* decisions to ascertain whether the statement bears indicia of certain factors that would make it testimonial. "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Statements are "testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id*. For example, the primary purpose of a testimonial statement is to create an out-of-court substitute for trial testimony. *Ohio v. Clark*, 576 U.S. 237, 245, 135 S.Ct. 2173, 192 L.Ed.2d 306 (2015). That primary purpose must be measured objectively by the trial court, accounting for the perspectives of the interrogator and the declarant. *Michigan v. Bryant*, 562 U.S. 344, 367-368, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011).

*State v. Smith*, 2024-Ohio-5745, ¶ 33-34.

{¶91} In *Smith*, the Court further observed that in examining a case concerning a mortally wounded victim, the United States Supreme Court has "reiterated the importance of ascertaining whether the statements were made during an ongoing emergency." *Smith* at ¶ 37, citing *Bryant* at 361. "Another factor that should be considered is the degree of formality of the interrogation." *Smith* at ¶ 38, citing *Bryant* at 366. (i.e., whether the interrogation occurred in a public area versus a more formal area such as police headquarters). For instance, the informality of the location " 'suggests that the interrogators' primary purpose was simply to address what they perceived to be an ongoing emergency.' " *Smith* at ¶ 38, quoting *Bryant* at 377.

{¶92} Here, as set forth above, Detective Steele posed the question to Horn at the scene of the crime, just after the victim had been discovered mortally wounded, with knowledge that appellant had been seen running across U.S. Route 35. Further, upon receiving Horn's statement, Detective Steele's first act was to relay the information to the other responding units. The record reflects that a manhunt ensued before appellant was finally apprehended, after disposing of the murder weapon. We conclude that under these circumstances, Horn's nonverbal statement was nontestimonial. Therefore, its admission did not violate the Confrontation Clause. As a result, defense counsel's failure to object to the admission of the statement on Confrontation Clause grounds did not constitute

deficient performance or otherwise result in prejudice to appellant. Accordingly, having found counsel's assistance was not ineffective in this regard, we find no merit to this argument.

### E. Failure to Investigate and Present a Consistent Defense

{¶93} Appellant contends that considering his trial counsel's failure to move for suppression of his confession and the statements of Horn, "there was no reasonable defense that included suggesting someone else was the shooter." He argues the only reasonable defenses were 1) developing a record to provide a basis to obtain lesser included and inferior degree offense instructions; and 2) developing a record to establish that appellant did not possess the necessary mens rea to be found guilty of the murder counts. He further argues that there were multiple witnesses that could have been called to provide information related to threats the victim had made. In sum, appellant claims that his counsel acted deficiently by providing an ambiguous and inconsistent defense that included insinuations that appellant was not the shooter, and that law enforcement was deficient in its investigation.

{¶94} The State responds by pointing out that appellant fails to "suggest how trial counsel could have proceeded differently because of appellant's own statements to the police and the facts of the case." The State further argues that

appellant has failed to articulate how the calling of additional witnesses that had information about the threats would have helped his defense.

{¶95} A review of the record indicates that trial counsel primarily proceeded to trial with a plan to seek jury instructions on the inferior degree offense of voluntary manslaughter and the lesser included offense of involuntary manslaughter. This theory was consistent with appellant's statements made to police, but it required additional mitigating elements be proven, namely provocation and/or passion and rage. When it became clear that the trial court did not believe the evidence was sufficient to provide the requested jury instructions, trial counsel was left with few options in light of appellant's prior confession. Appellant argues counsel should have developed a record to establish that he did not possess the necessary mens rea to be found guilty of the murder counts. However, already properly in evidence were appellant's statements that he shot the victim because he was scared, not by accident or any other reason. The evidence further established that appellant shot the victim at fairly close range, and not once, but multiple times. With these facts in mind, it would have been difficult and disingenuous to argue that appellant did not possess the mens rea to commit murder.

{¶96} What was also disingenuous at that point was defense counsel's suggestion that someone else may have been the shooter. However, considering

that appellant had confessed to shooting the victim, defense counsel was left with little other strategy than a complete concession of guilt. The Supreme Court of Ohio has noted, albeit in the penalty phase of a murder trial, that "it is not necessarily deficient performance for defense counsel to present inconsistent alternative theories to the jury." *State v. Mundt*, 2007-Ohio-4836, ¶ 134, citing *Brown v. Rice* (W.D.N.C.1988), 693 F.Supp. 381, 398, reversed in part on other grounds, *Brown v. Dixon* (C.A.4, 1989), 891 F.2d 490, 498-500. "Nor does a midtrial change in strategy necessarily constitute deficient performance." *Mundt* at ¶ 134, citing *Gabourie v. State* (App.1994), 125 Idaho 254, 260, 869 P.2d 571.

{¶97} Moreover, even if counsel's tactical choice did constitute deficient performance, appellant has not demonstrated that the outcome would have been different but for this argument. In view of the totality of the evidence, it is unlikely that the presentation of this defense argument, rather than an argument that appellant did not possess the required mens rea for the charged offenses, changed any juror's opinion as to appellant's guilt. Hence, it is not likely that the outcome would have been otherwise but for counsel's inconsistent argument. As such, we find no merit to this argument.

### F. Failure to Effectively Argue for the Inferior and Lesser Included Jury Instructions

{¶98} Appellant argues that trial counsel was ineffective by failing to articulate how the record supported the request for lesser included and inferior

degree offense instructions.  In particular, appellant claims that counsel should have rebutted the trial court's "determination that words alone constituted the basis for the provocation," and should have better articulated the "aggressive actions of Elmore that were coupled with the threat."  Contrary to appellant's argument, trial counsel made an extensive argument in favor of lesser included offense and inferior degree offense instructions.  There was much discussion on the record regarding appellant's entitlement to the instructions and the trial court took the matter under advisement and conducted its own research before denying the requested instructions.

{¶99} As set forth above, the trial court correctly referenced the doctrine that words alone do not constitute a sufficient basis for provocation *in most situations*.  That was a correct statement of the law.  Importantly, the trial court did not qualify the threats at issue herein as "words alone."  The trial court was well aware, as it was clearly in evidence, that the victim not only made verbal threats, but he traveled to the hotel where appellant and Horn were staying in an effort to find Horn.  Moreover, the trial court went on to accurately note that while the record contained evidence that appellant acted upon fear, there was no evidence that he acted under the influence of passion or a sudden fit of rage.  As such, any further argument made by defense counsel would have been futile and the lack

thereof did not change the outcome of trial or otherwise result in prejudice to appellant.  Accordingly, we find no merit to this argument.

## G.  Failure to Object to Irrelevant and Prejudicial Body Camera and Autopsy Photos

{¶100} Appellant contends that his trial counsel failed to object to the introduction of "gruesome, irrelevant, and prejudicial body camera footage and autopsy photographs."  Appellant argues that the photos and footage were irrelevant because there was no argument that the victim died of anything other than being shot, and that the sole intention of admitting these exhibits was to "enflame the passions of the jury."  Appellant claims that his counsel abdicated his duty in failing to object to their admission.

{¶101} The State responds by arguing that the video evidence and photographs "were essential to proving its case."  More specifically, the State contends that the video footage was relevant and admissible to the arrival of law enforcement to the scene and to demonstrate how Spangler, a witness who arrived at the scene first, handled a cell phone that she had found lying on the ground.  The State also contends that the video footage was relevant and probative to refute any argument that Horn may have removed a gun from the victim, which could have gone to a self-defense argument.  The State further contends that the autopsy photos showed the cause of death and demonstrated that the victim was inside his

car when he was shot, due to the pooling of blood, rather than outside of his

vehicle, as had been previously argued by the defense.

{¶102} Evid.R. 401 provides " 'Relevant evidence' means evidence having

any tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be

without the evidence."  "Although relevant, evidence is not admissible if its

probative value is substantially outweighed by the danger of unfair prejudice * *

*."  Evid.R. 403(A).  In *State v. Hurst*, this Court observed as follows:

> "Exclusion on the basis of unfair prejudice involves more than a
> balance of mere prejudice.  If unfair prejudice simply meant
> prejudice, anything adverse to a litigant's case would be
> excludable under Rule 403.  Emphasis must be placed on the
> word 'unfair.'  Unfair prejudice is that quality of evidence which
> might result in an improper basis for a jury decision.
> Consequently, if the evidence arouses the jury's emotional
> sympathies, evokes a sense of horror, or appeals to an instinct to
> punish, the evidence may be unfairly prejudicial."  (Internal
> quotation marks omitted.)  [*State v. Crotts*, 2004-Ohio-6550, ¶
> 24], quoting *Oberlin v. Akron Gen. Med. Ctr.* (2001), 91 Ohio
> St.3d 169, 172, 743 N.E.2d 890, quoting Weissenberger's Ohio
> Evidence (2000) 85-87, Section 403.3.

*State v. Hurst*, 2012-Ohio-2465, ¶ 14.

{¶103} Here, we accept the State's assertions as to why these exhibits were

relevant and admissible, despite their gruesome nature.  The State had the burden

of proving that appellant purposely killed the victim, and these photos and video

were probative of that issue.  *See State v. Mammone*, 2014-Ohio-1942, ¶ 99.  *See*

*also State v. Trimble*, 2009-Ohio-2961, ¶ 134 (affirming the admission of admittedly gruesome crime scene photographs, holding they were relevant on issues of intent and showed the manner and circumstances surrounding the deaths). Under these circumstances, we find the probative value of these exhibits outweighed the danger of unfair prejudice. Thus, even if defense counsel had objected to the admission of the photos and video, admission of the evidence was within the discretion of the trial court and likely would have been admitted over objection based upon the above rationale.

{¶104} Furthermore, even if we excise the purportedly irrelevant and prejudicial evidence, the remaining evidence supports appellant's conviction. As a result, even if trial counsel's failure to object to the admission of the evidence constituted deficient performance, that performance did not affect appellant's substantial rights, i.e., it did not affect the outcome of the trial. Therefore, we find this argument is without merit.

### H. Failure to Investigate and Present a Case in Mitigation

{¶105} Appellant contends that trial counsel failed to investigate and present any mitigation evidence, despite the fact that he was facing decades in prison. He argues that counsel should have presented evidence providing the court with "insight into his life," including his adolescence and upbringing, his education history, his physical and mental health, "the fact that the victim induced the

offense," and "the fact that [he] acted under serious provocation." He argues that instead, the trial court only received a "frail reference to mental health problems and a history of substance abuse." The State responds by noting that defense counsel did point out some mitigating factors. The State also argues that appellant has failed to point out the information that would have been favorable to him with respect to these mitigating factors and that this Court "cannot infer a defense failure to investigate from a silent record."

{¶106} First, with respect to appellant's argument that his trial counsel failed to investigate in order that evidence could be presented in mitigation of sentence, this Court has stated as follows:

> Generally, an attorney's failure to reasonably investigate a defendant's background and present mitigating evidence at sentencing can constitute ineffective assistance of counsel. *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, ¶ 38, citing *Wiggins v. Smith*, 539 U.S. 510, 521–522, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). "Defense counsel has a duty to investigate the circumstances of his client's case and explore all matters relevant to the merits of the case and the penalty, including the defendant's background, education, employment record, mental and emotional stability, and family relationships." *Goodwin v. Johnson*, 632 F.3d 301, 318 (6th Cir. 2011). However, a defendant has the burden to demonstrate that counsel rendered ineffective assistance by failing to conduct an adequate investigation. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, at ¶ 104, citing *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Moreover, the Supreme Court of Ohio has indicated that we "cannot infer a defense failure to investigate from a silent record." *Hunter, supra*, at ¶ 65, citing *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 244.

*State v. McIntyre*, 2020-Ohio-2680, ¶ 12 (4th Dist.).

We conclude that appellant has failed to meet his burden of demonstrating that counsel rendered ineffective assistance by failing to investigate. If there exists additional information related to Appellant's background, education, employment record, mental and emotional stability that would have mitigated in his favor, it is not in the record and this Court cannot make inferences from a silent record.

{¶107} Next, with respect to appellant's argument that his trial counsel failed to present evidence in mitigation of sentence, we initially note that the "[f]ailure to present mitigating evidence * * * does not in itself constitute proof of ineffective assistance of counsel." *State v. Hamblin*, 37 Ohio St.3d 153, 157 (1988). Further, as noted by the State, this Court has previously observed that " 'the decision to forego the presentation of additional mitigating evidence does not constitute proof of ineffective assistance of counsel.' " *State v. Collins*, 2019-Ohio-3428. ¶ 20, quoting *State v. Keith*, 79 Ohio St.3d 514, 536 (2001). Importantly, " '[t]he presentation of mitigating evidence is matter of trial strategy.' " *Collins* at ¶ 20, quoting *Keith* at 530.

{¶108} The trial court imposed the maximum sentence on each count and ordered that all prison terms run consecutively to one another for an aggregate term of 24 years to life in prison. In doing so, the trial court rejected any claim that appellant acted upon provocation by the victim. The sentencing hearing transcript

indicates that defense counsel began by acknowledging that the trial court possessed little discretion in sentencing in this case, as many of the offenses required mandatory terms of imprisonment. Further, the court pointed out that the only sentence available for the murder conviction was a mandatory prison term of fifteen years to life, along with a mandatory three-year prison term for the attendant firearm specification, that was required to be served consecutively to the sentence for the murder conviction.

{¶109} Contrary to appellant's arguments, defense counsel did present an argument in mitigation of sentence. Counsel argued, with respect to the tampering with evidence conviction, that appellant had not committed the worst form of the offense, reminding the court that appellant voluntarily surrendered after he was cornered and that he cooperated with law enforcement by drawing a map so that they could locate the missing firearm. Counsel claimed that appellant was remorseful and would have to live every day with the knowledge of what he had done. Counsel acknowledged that although appellant had a lengthy criminal record, the record contained "remarkably little" evidence of violence. Counsel further argued that appellant had led a troubled life and had battled drug addiction since he was a teenager. Counsel also noted that appellant suffered from mental health issues, which he had been attempting to address since being incarcerated, and that he had enrolled in classes to try to better himself.

{¶110} Based upon this record, we cannot conclude that trial counsel was deficient in failing to argue more vigorously in mitigation of sentence. Because appellant has not established that his counsel's performance was deficient, he cannot demonstrate that he received ineffective assistance of counsel. Thus, we find no merit to this argument.

### I. Cumulative Ineffective Assistance of Counsel

{¶111} Appellant contends that the cumulative effect of counsel's deficient performance resulted in a complete deprivation of counsel. Under the cumulative-error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64 (1995), citing *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus; *State v. Ruble*, 2017-Ohio-7259, ¶ 75 (4th Dist.). "Before we consider whether 'cumulative errors' are present, we must first find that the trial court committed multiple errors." *State v. Smith*, 2016-Ohio-5062, ¶ 106 (4th Dist.), citing *State v. Harrington*, 2006-Ohio-4388, ¶ 57 (4th Dist.).

{¶112} The cumulative error doctrine does not apply where the defendant "cannot point to 'multiple instances of harmless error.' " *State v. Mammone*, 2014-Ohio-1942, ¶ 148 ("And to the extent that Mammone more broadly invokes the

doctrine of cumulative error, that doctrine does not apply because he cannot point to 'multiple instances of harmless error.' "); *State v. Fannon*, 2018-Ohio-5242, ¶ 124-125 (4th Dist.); *State v. Thacker*, 2021-Ohio-2726, ¶ 69-71 (4th Dist.).

{¶113} Appellant argues that cumulative errors violated his constitutional right to a fair trial. However, because we found no errors, the cumulative error doctrine does not apply. *Mammone* at ¶ 173; *State v. Maxwell*, 2014-Ohio-1019, ¶ 253 (doctrine of cumulative error is not applicable where there are not numerous instances of trial court error and defendant was not prejudiced by any error at the trial or penalty phase of the proceedings); *State v. Ludwick*, 2022-Ohio-2609, ¶ 53-57 (4th Dist.) (cumulative error doctrine does not apply where there was only one harmless error found); *State v. Spring*, 2017-Ohio-768, ¶ 59 (7th Dist.) (cumulative error doctrine does not apply to one or two minor errors).

{¶114} However, having found no merit in any of the prior alleged instances of ineffective assistance of counsel, we find no cumulative error occurred. Thus, this argument is without merit.

{¶115} Having found no merit to any of appellant's assignments of error, the judgment of the trial court is affirmed.

**JUDGMENT AFFIRMED.**

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted.  The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and Wilkin, J. concur in Judgment and Opinion.

For the Court,

_____
Jason P. Smith
Presiding Judge

## **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**